Thomas Buchele, CA Bar No. 129657
Bridgett Buss (*Pro Hac Vice* application to be filed)
Earthrise Law Center
Lewis & Clark Law School
10101 S Terwilliger Blvd.
Portland OR  97219-7799
Tel:  503-768-6736 (Buchele)
Tel:  503-768-6825 (Buss)
Fax: 503-768-6642
Email: tbuchele@lclark.edu
Email: bridgettbuss@lclark.edu

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **EARTH ISLAND INSTITUTE**, a non-profit corporation, <br><br> Plaintiff, <br><br> v. <br><br> **CICELY MULDOON**, in her official capacity as Superintendent of Yosemite National Park; **UNITED STATES NATIONAL PARK SERVICE,** an agency of the United States Department of the Interior; **UNITED STATES DEPARTMENT OF THE INTERIOR,** <br><br> Defendants. | No. <br><br> **COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF** <br><br> Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*; National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* |

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 701-706 (APA) and 28 U.S.C. §§ 1331 (federal question), and 2412 (costs and fees). Plaintiff is challenging a final agency action of the National Park Service ("NPS"), as defined by the Administrative Procedure Act ("APA"), 5 U.S.C. § 704 (actions reviewable).

2.      Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e) because the events or omissions giving rise to this claim occurred in this district, primarily in Mariposa County.

3.      An actual judiciable controversy exists between the parties hereto.

**INTRADISTRICT VENUE**

4.      This case is properly filed in Fresno, California and properly before the Fresno Division of this District pursuant to Local Rule 120(d) because the events or omissions giving rise to this claim occurred, and are occurring, in Yosemite National Park in Mariposa County.

**INTRODUCTION**

5.      Plaintiff Earth Island Institute ("EII") challenges Defendant National Park Service's ("NPS") Categorial Exclusion Documentation Form ("CE Form"), approving the Yosemite National Park's Biomass Removal and Thinning to Protect Sequoias, Wildlife Habitat and Communities Project ("Biomass Removal Project" or "the Project"). Defendant Yosemite National Park Superintendent Cicely Muldoon ("Muldoon") signed the CE Form on August 17th, 2021. Defendants NPS, Muldoon, and the Department of the Interior ("DOI") are collectively referred to herein as "Defendants," "National Park Service," or "NPS." The CE Form violates the National Environmental Policy Act ("NEPA") and its implementing regulations and the APA.

6.      The Biomass Removal Project approves the logging of trees, including an undisclosed amount of commercial logging, on over two-thousand acres in Yosemite National Park. This removal occurs two-hundred feet from the centerline on both sides of the following roads and trails:

- the intersection of Wawona Road and Alder Creek to South Side Drive (16.68 miles, 810.77 acres)
- the intersection of Henness Ridge Road and Wawona Road to park boundary (0.79 miles, 41.15 acres)
- the intersection of South Side Drive and Wawona Road to Big Oak Flat Road (1.86 miles, 92.72 acres)
- the intersection of Big Oak Flat Road and El Portal Road to Merced Grove parking lot (13.22 miles, 643.3 acres)
- the intersection of Tioga Road and Big Oak Flat Road to Gin Flat (3.76 miles, 184.44 acres)
- Merced Grove Trail (1.21 miles, 64.6 acres)
- the intersection of Merced Grove truck trail north and Merced Grove Parking Lot to Y (1.21 miles, 61.33 acres)
- the intersection of Merced Grove truck trail south and Y to park boundary (2.57 miles, 68.25 acres)
- the intersection of South Landing Road and Oak Flat Road to park boundary (2.12 miles, 63.35 acres)

Removal will also occur on approximately 120 acres within the Merced Grove of sequoias and downhill of the grove. The Project area includes habitat used by ESA listed and sensitive species, such as the Pacific fisher, black-backed woodpecker, great grey owl, and spotted owl. Plaintiff first became aware that logging pursuant to this Project was occurring on or about May 11, 2022 and alleges on information and belief that such logging is still continuing as of the date of this complaint.

7.     The NPS approved this Project for the stated purpose of reducing post-drought and post-fire fuels by returning the area to what NPS asserts was pre-settlement density, which could result in as little as twenty-four trees per acre. No source was referenced in support of NPS's assumption regarding historical tree density. There was no mention of the many recent scientific studies which report much higher historical tree densities and which report that removing mature trees and dead trees tends to increase, not decrease, overall wildfire severity, while also increasing carbon emissions. The NPS plans to reach their goal by "thinning conifers <20" diameter, standing dead trees, and removing dead and down trees that died after the 2012-2016 drought." CE Form at 1. The NPS's CE Form is not clear regarding how many trees will actually be removed, nor what percentage of those trees will be used for commercial purposes. The Defendants relied upon an inappropriate "categorical exclusion" ("CE") to exempt the Project from additional required analysis under NEPA, and, in their words, "tiered" to an admittedly

outdated Fire Management Plan ("FMP") environmental impact statement ("EIS"), which has not been made available to Plaintiff or the general public for review.

8.     The specific categorical exclusion relied upon by the NPS to approve the Project is one which exempts from further NEPA review "[c]hanges or amendments to an approved plan, when such changes would cause no or only minimal environmental impact." CE Form at 3. The approved Project, however, does not involve a change or amendment to an approved plan. Instead, it authorizes site-specific activities including cutting live, mature trees and "hazard" trees, stump grinding, off-road log hauling, and the chipping and/or burning of limbs that purport to implement, but are in other ways contrary to an "approved plan." Despite its failure to describe changes or amendments to an approved plan, the CE Form does reference a previously approved plan – the 2004 Fire Management Plan ("2004 FMP") – in the context of "tiering" to it, as well as multiple references to how the proposed Project is inconsistent with the 2004 FMP.

9.     Further, even if the Project *does* involve a change or amendment to an approved plan, the Project would still not fit under the cited CE because it does not "cause no or only minimal environmental impacts." CE B.1, CE Form at 3. The logging of thousands of acres, including an undisclosed amount of commercial logging, within one of the most popular National Parks in the United States, and in areas where endangered and sensitive wildlife species such as the Pacific fisher and great grey owl may be present, will almost certainly have more than a "minimal" environmental impact. The CE Form repeatedly claims beneficial impacts, including purported beneficial impacts to wildlife and wildlife habitat, but under NEPA purported beneficial impacts can be considered significant impacts and must also be fully disclosed and analyzed. Further, the Project approval, in part, relies upon a management plan that authorizes the NPS to log trees up to 12" in diameter, but the Project anticipates and approves logging of trees up to 20" in diameter. CE Form at 1, 2. At minimum, the logging of trees larger than 12", contrary to what is anticipated by the 2004 FMP, will also have a more than minimal impact on the environment.

10.     In addition to citing the CE as authorization for the Project, the NPS also appears to assert that Project activities are compliant with, and therefore approved by, two other

documents/analyses: (1) the Merced Grove Special Management Area Burn Preparation and Fire Fuels Thinning Project Phase I into Phase II, and (2) the 2004 FMP EIS "with several additions." CE Form at 1. Plaintiff has been unable to locate, and the NPS has not provided, documentation for "Phase I" of the Project, the 2004 FMP EIS, the "additions", nor any other analyses of the Project's environmental impacts. Without these documents, Plaintiff and other members of the public are unable to ascertain whether Project activities are in fact authorized by these documents, nor whether the Project violates NEPA or other federal laws in other ways.

11.     In order to prevent the NPS from logging in ways that will degrade old forest and trees and result in violations of the NPS's duties under NEPA, Plaintiff seeks from this Court declaratory and injunctive relief, including if necessary a preliminary injunction, or in the alternative a temporary restraining order, and an order setting aside the NPS's illegal CE Form to prevent such violations of law and irreparable harm from occurring.

## PARTIES

12.     Plaintiff **EARTH ISLAND INSTITUTE ("EII")** is a nonprofit corporation organized under the laws of the State of California. EII is headquartered in Berkeley, California. EII's mission is to develop and support projects that counteract threats to the biological and cultural diversity that sustain the environment. Through education and activism, these projects promote the conservation, preservation, and restoration of the earth. One of these projects is the John Muir Project—whose mission is to protect all federal public forest and parklands from commercial exploitation that undermines and compromises science-based ecological management. The John Muir Project offices are located in San Bernardino County, California. EII is a membership organization with over 15,000 members in the United States, many of whom use and enjoy the National Parks of California for recreational, educational, aesthetic, spiritual, and other purposes. EII through its John Muir Project has a longstanding interest in protection of federal public lands. EII's John Muir Project and EII members actively participate in governmental decision-making processes with respect to federal public lands in California and

1  rely on information provided through the NEPA processes to increase the effectiveness of their

2  participation.

3      13.    EII's members include individuals who regularly use public lands within Yosemite

4  National Park, including the Biomass Removal Project areas proposed for logging in particular,

5  for scientific study, recreational enjoyment, aesthetic beauty, and nature photography. These

6  members' interests will be irreparably harmed by the planned logging, as they will no longer be

7  able to scientifically study these areas in their current state, take nature photographs of the area in

8  its current state, or enjoy the aesthetic beauty of the unlogged forest habitat and its inhabitants.

9      14.    EII officers, staff, and supporters reside near and/or regularly visit the Yosemite

10  National Park Biomass Removal Project area. EII officers, staff, and supporters derive

11  recreational, inspirational, religious, and aesthetic benefit from their activities within Yosemite

12  National Park, including the area in and around the Project area, and intend to continue to use and

13  enjoy these areas frequently and on an ongoing basis in the near and distant future. Specifically,

14  at least one of EII's supporters is interested in specific species which are known to reside in and

15  around the project area, such as the Pacific fisher, black-backed woodpecker, the spotted owl, and

16  the great grey owl. If the NPS continues to execute the Biomass Removal Project as described in

17  the CE Form, Project activities will negatively affect the habitat for these species, which will

18  cause EII's supporters to avoid the project area.

19      15.    EII has an organizational interest in the proper and lawful management of

20  Yosemite National Park. EII's aesthetic, recreational, scientific, and religious interests have been

21  and will be adversely affected and irreparably injured if Defendants continue to act as alleged

22  herein. These are actual, concrete injuries caused by Defendants' failure to comply with

23  mandatory duties under NEPA. The injuries would be redressed by the relief sought.

24      16.    EII has not had the opportunity to participate in administrative actions to protect

25  Plaintiff or its interests within the Project area because the NPS did not make the proposed

26  Project available to the public for notice and comment. In addition, many of the documents upon

27  which the NPS relies are not publicly available and have not yet been provided to EII despite

28  submitting a Freedom of Information Act ("FOIA") request, discussed in additional detail below.

EII has exhausted any and all available administrative remedies. Reviewable final agency action exists that is subject to this Court's review under 5 U.S.C. §§ 702 & 704.

17.     The National Park Service's implementation of the Biomass Removal Project is in contravention of the NEPA. Because Defendants' actions approving the Project violate the law, a favorable decision by this Court will redress the actual and imminent injuries to Plaintiff. If the National Park Service were to comply with NEPA, it would cease Project implementation until it has completed the requisite NEPA analysis demanded by the Project. It is possible that this may involve exempting the Project under an appropriate CE with proper documentation. It is more likely, however, that the necessary NEPA analysis would involve preparing either an environmental assessment ("EA") or environmental impact statement ("EIS") to consider the significant effects from the project, given the potential significant effects to the Pacific fisher and great grey owl, and the potential for the logging to increase wildfire severity in and around Yosemite Valley and put the public at risk. The analysis would consider additional alternatives to the proposed action, and could minimize or avert the harm to Plaintiff's members that will be caused from the logging of trees and destruction of wildlife habitat by the proposed actions.

18.     Defendant **CICELY MULDOON**, Superintendent of the Yosemite National Park, approved the Biomass Removal Project and signed the Categorical Exclusion Documentation Form ("CE Form") challenged in this case. The CE Form was the NPS's final agency action regarding the Biomass Removal Project. Defendant Muldoon is only sued in her official capacity.

19.     Defendant **NATIONAL PARK SERVICE** is an agency of the United States and is a division of the Department of the Interior, and is charged with preserving the natural and cultural resources and values of the National Park System, in accordance and compliance with NEPA and its implementing regulations.

20.     Defendant **DEPARTMENT OF THE INTERIOR** is an executive department of the United States, and is charged with protecting and managing the Nation's natural resources and cultural heritage. The National Park Service is an agency within this department.

**STATUTORY AND REGULATORY FRAMEWORK**

1

**National Environmental Policy Act (42 U.S.C. §§ 4321-4370(h))**

2      21.    Congress enacted the National Environmental Policy Act ("NEPA") in 1969,

3   directing all federal agencies to assess the environmental impacts of proposed actions that

4   significantly affect the quality of the human environment. NEPA seeks to "promote efforts which

5   will prevent or eliminate damage to the environment and biosphere and stimulate the health and

6   welfare of man." 42 U.S.C. § 4321. The primary purposes of NEPA, 42 U.S.C. §§ 4321-4370(h),

7   are to ensure fully informed decision-making and to provide for public participation in

8   environmental analysis and decision-making. 40 C.F.R. §§ 1500.1(a), (b). NEPA's public

9   disclosure goals are twofold: (1) to ensure that the agency has carefully and fully contemplated

10  the environmental effects of its action; and (2) to ensure that the public has had sufficient

11  information to review, comment on, and challenge (if necessary) the agency's action. *See* 42

12  U.S.C. §§ 4321, 4332.

13      22.    The Council on Environmental Quality ("CEQ") promulgates regulations

14  implementing NEPA. CEQ's regulations are binding on all federal agencies, 40 C.F.R. §

15  1500.3(a), and can be found at 40 C.F.R. Parts 1500–1508.

16      23.    Agency actions taken pursuant to NEPA are reviewable by this Court under the

17  APA. 5 U.S.C. §§ 702, 704, 706.

18      24.    There are three potential avenues for federal agencies to comply with NEPA, each

19  reflecting a different level of analysis required to meet statutory and regulatory requirements.

20  These are, in descending level of complexity, an Environmental Impact Statement ("EIS"), an

21  Environmental Assessment ("EA"), or a Categorical Exclusion ("CE").

22      25.    An EIS is appropriate where the agency anticipates that the proposed action will

23  likely have a significant impact, 40 C.F.R. § 1501.3(a)(3), because federal agencies must prepare

24  an EIS for all "major federal actions significantly affecting the quality of the human

25  environment." 42 U.S.C. § 4332(2)(C). Under NEPA, both adverse and claimed beneficial

26  impacts are relevant and may be significant. *See* 40 C.F.R. § 1508.1(g)(4).

27      26.    An EA is appropriate where the agency anticipates that the proposed action is not

28  likely to have significant impacts, or if the significance of impacts is unknown. 40 C.F.R. §§

7   COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

1501.3(a)(2), 1501.5(a), 1508.1(h). If, after preparing the EA, the agency determines that the action *will* have significant impacts, then it must prepare an EIS. 40 C.F.R. § 1501.3(a)(3). If the agency determines that it *will not* have significant impacts, then it must issue a finding of no significant impact ("FONSI"). 40 C.F.R. § 1501.6(a).

27.     A CE is appropriate for "categories of actions that normally do not have a significant effect on the human environment, and therefore do not require preparation of an environmental assessment or environmental impact statement." 40 C.F.R. § 1501.4(a). CEs must be identified in an agency's NEPA procedures. 40 C.F.R. § 1507.3(e)(2)(ii).

28.     A CE is inappropriate, however, where its use is precluded by the presence of extraordinary circumstances. *See* 40 C.F.R. § 1501.4. If the agency determines that extraordinary circumstances exist, the agency "nevertheless may categorically exclude the proposed action if the agency determines that there are circumstances that lessen the impacts or other conditions sufficient to avoid significant effects." 40 C.F.R. § 1501.4(b)(1).

29.     Consequently, to avoid preparation of either an EA or EIS, the agency must employ an established CE which specifically exempts the proposed action from additional NEPA review, conduct any necessary scoping, and determine that no extraordinary circumstances preclude use of the CE.

30.     "[W]hen it would eliminate repetitive discussions of the same issues, focus on the actual issues ripe for decision, and exclude from consideration issues already decided or not yet ripe at each level of environmental review," NEPA allows agencies to "tier" to existing NEPA documents. 40 C.F.R. § 1501.11(a). The CEQ's NEPA-implementing regulations identify two situations in which tiering is appropriate, both of which involve tiering only to and/or from an EIS or an EA. *Id.* at § 1501.11(c). The regulations neither discuss nor authorize an agency to tier to or from a CE.  A CE, by definition, is an action that "normally do[es] not have a significant effect on the human environment[,]" 40 C.F.R. § 1508.1(d), and thus does not require further analysis under NEPA.

31.     According to the CEQ NEPA-implementing regulations, "[t]iering is appropriate when the sequence from an [EIS] or [EA] is:  (1) From a programmatic, plan, or policy

environmental impact statement or environmental assessment to a program, plan, or policy statement or assessment of lesser or narrower scope or to a site-specific statement or assessment[;] (2) From an environmental impact statement or environmental assessment on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement or assessment at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the lead agency to focus on the issues that are ripe for decision and exclude from consideration issues already decided or not yet ripe." 40 C.F.R. § 1501.11(c)(1)-(2). *See also* 43 C.F.R. § 46.140.

32.     In order to properly tier to another document, the agency must "summarize and incorporate by reference the issues discussed in the broader document. The tiered document shall concentrate on the issues specific to the subsequent action. The tiered document shall state where the earlier document is available." 40 C.F.R. § 1501.11(b).

**Department of the Interior NEPA-Implementing Regulations (43 C.F.R. Part 46)**

33.     DOI's NEPA-implementing regulations include a list of "Departmental categorical exclusions" available for use by all departments within the DOI, including NPS. *See* 43 C.F.R. § 46.210. In addition to the DOI Departmental CEs, the NPS also has agency-specific CEs that it may use. These agency-specific CEs are included in the DOI's "Departmental Manual," 516 DM 12.

34.     As required by NEPA, the DOI NEPA-implementing regulations also provide a list of extraordinary circumstances which may nevertheless require NEPA analysis for actions which may otherwise typically be categorically excluded from review. 43 C.F.R. § 46.215. One of these specifically identified extraordinary circumstances is when a proposed action may "[h]ave significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species." 43 C.F.R. § 46.215(h).

35.     With regard to tiering, the DOI NEPA regulations state that tiering documents "must include a finding that the conditions and environmental effects described in the broader NEPA document are still valid or address any exceptions[,]" 43 C.F.R. § 46.140, and that "[t]o

the extent that any relevant analysis in the broader NEPA document is not sufficiently comprehensive or adequate to support further decisions, the tiered NEPA document must explain this and provide any necessary analysis." *Id.* at § 46.140(b).

## National Park System Management (54 U.S.C. §§ 100101 – 104909)

36.     The fundamental purpose of the National Park System units is "to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). The Secretary of the Interior as well as the Director of the NPS are instructed to "promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose" of the system. *Id.*

37.     This Congressional mandate to manage for non-impairment preempts any contrary NPS regulations or guidance unless Congress expressly provides for such a deviation. "[P]romotion and regulation of the various System units shall be consistent with and founded in the purpose established by subsection (a), to the common benefit of all the people of the United States." 54 U.S.C. § 100101(b)(2). "The authorization of activities shall be construed and the protection, management, and administration of the System units shall be conducted in light of the high public value and integrity of the System and shall not be exercised in derogation of the values and purposes for which the System units have been established, except as directly and specifically provided by Congress." *Id.*

## Administrative Procedure Act (5 U.S.C. §§ 701-706)

38.     Section 702 of the APA, 5 U.S.C. § 702, provides a private cause of action to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute[.]" The APA provides a cause of action to challenge any final agency action where there is no other adequate remedy in a court. 5 U.S.C. § 704.

39.     Under Section 706 of the APA, reviewing courts "shall…(1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency action, findings, and conclusions found to be… arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law[.]" 5 U.S.C. §§ 706(1), 706(2)(a), (d).

40.     NEPA does not contain specific judicial review provisions, and the NPS's actions governed by NEPA, such as the Biomass Removal Project, are therefore subject to judicial review under the APA.

**ADDITIONAL FACTS GIVING RISE TO THE PLAINTIFF'S CAUSE OF ACTION**

41.     Yosemite National Park was established by Congress in 1864 with a grant of land to the State of California whereby "the premises shall be held for public use, resort, and recreation[.]" S. 203; Public Act No. 159.

42.     The Park is located near central California, and has grown to encompass approximately 748,000 acres of land. The forests, grasslands, and rivers of the Yosemite National Park provide important habitat for fish and wildlife, and is a popular destination among the recreating public due to its breathtaking scenery and variety of recreational opportunities in remote and/or relatively undisturbed natural settings. The Park is also used by members of the public for wildlife viewing, photography, and scientific studies of species, habitats, and other important biological processes. Plaintiff's members use the Park for such purposes, and have an interest in the proper management of Park resources.

43.     The Biomass Removal Project CE Form was approved and signed by Defendant Muldoon in August of 2021, Plaintiff EII did not become aware of the implementation of extensive logging associated with this Project until May 11, 2022, after an EII-JMP volunteer witnessed project implementation, followed by an EII-JMP staff member witnessing project implementation on May 13, 2022. Plaintiff confirmed such logging was continuing during the week of June 7th, and Plaintiff alleges on information belief that such logging is continuing as of the date of this complaint.

44.     Plaintiff can find no information indicating that the NPS notified the public about this action before the NPS made its final decision, and no information indicating that NPS sought public comment regarding this action. Plaintiff was and is concerned that Project activities were not subject to a legally valid NEPA review process, and sought to review the NPS's documentation approving this destructive Project. On the morning of May 11, 2022, Plaintiff and its counsel visited the NPS's Yosemite Park website and the general Park Planning website in order to locate and review the agency's documentation authorizing the Project.

45.     On May 11, 2022, Plaintiff was only able to locate a two-page description of the project, which included references to the following documents:

- PEPC 41967 Merced Grove Special Management Area Burn Preparation and Fire Fuels Thinning Project – Phase I into Phase II
- 2004 Fire Management Plan Environmental Impact Statement ("EIS")
- Forestry Programmatic CE (PEPC 79616)

Because these documents were relied upon to authorize the Project, they should have been made available to the public and included on the Project's webpage. They were not. Plaintiff was unable to locate these documents elsewhere on either NPS website, and so drafted a FOIA request seeking these documents, along with other records used to support authorization of the Biomass Removal Project.

46.     That FOIA request was submitted the next day, on May 12, 2022, with a request for expedited processing due to the time-sensitive nature of the request and to allow Plaintiff to discover and publicize any information about the logging in a National Park. The NPS notified Plaintiff, on May 20, 2022, that its request for expedited processing was denied. Plaintiff immediately began preparing a FOIA appeal, and submitted the appeal to NPS on May 23, 2022. That appeal was denied on June 10, 2022, meaning that Plaintiff is unlikely to receive any of the missing but requested project records before the end of June 2022 and possibly much later.

47.     On the same day that the NPS denied expedited processing (May 20, 2022), Plaintiff and its counsel spoke with Yosemite National Park FOIA Coordinator Quentin Kendall via telephone regarding the status of the request. Upon concluding that call, Mr. Kendall emailed

to Tom Buchele, Plaintiff's counsel, a copy of the CE Package used to approve the Biomass

Removal Project. That CE Package included the CE Form and other forms which identified

additional documents of interest, including but not limited to the following:

- 2017 Fire Management Plan amendment (PEPC 41967)

- Forestry Programmatic CE (PEPC 24425)

- Biological Assessment analyzing potential impacts to the Pacific fisher

- United States Fish and Wildlife Service ESA consultation concurrence letter
   received 8/3/2021

Plaintiff was able to locate some documents related to the first two items, but was unable to locate

the Biological Assessment or concurrence letter – documents which should have been made

available as part of the project record.

48.     Without having access to these documents, it has been difficult, and sometimes

impossible, for Plaintiff to fully evaluate statements made by the NPS in its Biomass Removal

Project CE Form, or to fully ascertain the legality of the agency's NEPA process overall with

regard to this Biomass Removal Project. Examples of evaluation impeded by this lack of

documentation include, but are not limited to, the following:

i.   A number of references are made to the 2004 FMP EIS to justify certain Project
      activities, but the EIS currently is not available, and has not been made available to
      Plaintiff for review. While the 2004 FMP's Record of Decision ("ROD") is posted to
      the agency webpage, this is a separate document that serves a different function under
      NEPA – and it cannot be used to confirm the assertions made by the NPS in the
      Project's CE Form.

ii.  Without the missing Biological Assessment and the consultation letter, Plaintiff cannot
      assess the NPS's compliance with NEPA or the Endangered Species Act regarding the
      listed species and listed species habitat that exists with the Project area.

iii. The Biomass Removal Project CE Form mentions two "Forestry Programmatic CE"
      documents – PEPC 79616 and PEPC 24425. CE Form at 1, 3. One of the project
      activities includes "[c]ut[ting] down hazard trees following criteria of the Forestry

CE[,]" but does not specify which "Forestry CE" this is. *Id.* at 1. Plaintiff currently does not have access to documents for PEPC 79616, and therefore can neither confirm if this includes the relevant "Forestry CE," nor check whether Project activities actually conform with those criteria if it does. The available "CE Package" for PEPC 24425 is for a project titled "2009-018 Programmatic Parkwide Forestry Work Plan" which cites to NPS CE E.3 which allows for "[r]emoval of park resident individuals… when such removal is included in an approved resource management plan." PEPC 24425 CE Package at 3. However, this CE Form appears to suffer from the same or similar deficiencies as the Biomass Removal Project CE Form, in that it is unclear which *approved* plan Programmatic Parkwide Forestry Work Plan activities purports to actually adhere to, and Plaintiff is unable to investigate this itself, because the "guide" plans mentioned in the form are not readily identifiable or locatable on the NPS website or elsewhere.

49.     As of the date of filing, the NPS has still not provided to Plaintiff the requested Project documents. The NPS's lack of transparency resulting from its outdated webpages, incomplete document sets, and withholding of relevant project documents and management plans is contrary to NEPA's stated goals of public participation and informed decision-making.

50.     Plaintiff may amend this complaint to include additional claims arising from, among other things, information made available to Plaintiff after the date of filing this complaint.

51.     The Biomass Removal Project is roughly 2,000 acres in size. The Project runs from Merced Grove into Yosemite Valley.

52.     The Yosemite Valley and the Giant Sequoias in Merced Grove are extremely popular and much cherished sites in the Yosemite National Park and are responsible for bringing many visitors to the Park, to recreate and to enjoy the natural beauty of the area.

53.     As alleged above, to properly use a categorical exclusion, the agency must choose one which actually covers the proposed action, conduct any necessary scoping, and explain why the categorical exclusion still applies in the face of any evidence that extraordinary circumstances may be present.

54.     The CE Form cites the "change and amend" CE, identified as CE B.1, CE Form at 3, as exempting the Biomass Removal Project from NEPA, an exclusion which permits changes and amendments to pre-approved plans when creating no or minimal environmental impacts. The NPS describes the Biomass Removal Project as Phase II of another project and as an expansion of their 2004 FMP. The NPS does not provide documentation for the 2004 FMP or "Phase I" of the project. The NPS has not provided any record of the actual changes that are being made to the FMP or Phase I. Consequently, the Biomass Removal Project does not fall within the CE that the NPS attempts to use.

55.     NEPA only allows tiering from a broader or earlier NEPA document to incorporate the broader programmatic analysis or earlier analysis from that document, and thereby avoiding duplication. That, however, is not what the NPS did here. First, the NPS admits that this Project expands on issues not addressed in the 2004 FMP EIS. Second, the NPS attempts to expand on that analysis in its CE Form, rather than in a site-specific EA or EIS. The NPS cannot utilize what it calls "tiering" to avoid completing further NEPA analysis through either an EIS or EA.

56.     The NPS failed to complete the subsequent analysis required when "tiering". Even when tiering, NEPA still requires the agency to address where the earlier document's assumptions may not remain valid or current, to identify where the broader NEPA document does not address specific impacts of a project, to complete an analysis to address those impacts, and to make that analysis available for public review. The NPS failed to identify what impacts of the Biomass Removal Project are not addressed in the 2004 FMP EIS, failed to analyze those impacts, and failed to make such analyses available for public review. Overall, the NPS failed to conduct any site-specific analysis to determine the impacts of the Biomass Removal Project. Consequently, the NPS must complete either an EA or an EIS to determine the environmental consequences of the project.

1

**CLAIMS FOR RELIEF**

2

**CLAIM ONE**

3

**(Violations of NEPA and APA)**

4      57.      Plaintiff realleges and incorporates by reference all preceding paragraphs into each

5    of the counts set forth below.

6

**COUNT ONE**

7

**(Failure to Complete an EIS, EA, or identify an appropriate CE)**

8      58.      In order to satisfy NEPA, for all proposed actions a federal agency must either

9    complete an EIS or EA to evaluate the environmental impacts of a proposed action, or it must

10   demonstrate that the proposed action is categorically excluded from additional NEPA review by

11   identifying an approved CE that exempts the specific action proposed.

12     59.      The NPS failed to do any of the above with regard to the Biomass Removal

13   Project. The NPS did not complete an EIS or EA. The NPS did identify a CE under which it

14   purported to categorically exclude the action from further NEPA review, but the proposed actions

15   do not fit within that identified CE.

16     60.      The NPS cites to CE "B.1 Changes or amendments to an approved plan, when

17   such changes would cause no or only minimal environmental impact[,]" to justify exempting the

18   Project from further review. However, the description of Project activities does not involve

19   "changes or amendments to an approved plan[.]" Instead, the Project activities are a site-specific

20   implementation of elements, purportedly pursuant to an approved plan. The Project description

21   makes no mention of changing or amending an approved plan; it describes discrete site-specific

22   actions that supposedly implement a plan.

23     61.      A CE is appropriate for "categories of actions that normally do not have a

24   significant effect on the human environment, and therefore do not require preparation of an

25   environmental assessment or environmental impact statement." 40 C.F.R. § 1501.4(a). CEs must

26   be identified in an agency's NEPA procedures. 40 C.F.R. § 1507.3(e)(2)(ii). The proposed actions

27   within the Biomass Removal Project do not fit within the CE identified by the NPS and thus that

28   CE cannot be used. The NPS has failed to identify a CE that covers the actions included in the

Project. Without such a CE, the NPS has failed to show that the Project's actions fall within a "categor[y] of actions that normally do not have a significant effect[.]" 40 C.F.R. § 1501.4(a).

62.     The NPS's failure to complete an EA, EIS, or to identify an appropriate CE with which to exclude the Project from further NEPA review, is arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA, in violation of the APA, 5 U.S.C. § 706(2)(A).

63.     Alternatively, NPS's "CE Form" authorizing the Project and the agency's decision to move forward with Project activities without first satisfying NEPA's procedural requirements was an agency action, finding, or conclusion that was without observance of procedure required by NEPA, and thus in violation of the APA, 5 U.S.C. §§ 706(1), 706(2)(d).

## COUNT TWO

### (Reliance upon inappropriate "NEPA" documentation to authorize logging in violation of Fire Management Plan standards)

64.     The NPS issued a "CE Package" to document the use of a CE to approve the Biomass Removal Project. The CE Package includes a Categorical Exclusion Documentation Form ("CE Form"), an Environmental Screening Form ("ESF"), and an Other Compliance/Consultations Form ("OCC Form").

65.     These forms are all created by the agency to assist with *documentation of NEPA compliance*, but the forms themselves do not, and cannot, fulfill NEPA compliance requirements themselves.

66.     The NPS uses CE Forms to identify and document the use of CEs, where such documentation is required by law. The CE Form is not itself a CE.

67.     While the CE Form may be used to document the use of legitimate and appropriate CEs in relation to proposed actions, the CE Form cannot be used in place of an EA or EIS, if the action does not fit entirely within an approved CE and would otherwise require additional analysis to determine the impacts of the action.

68.     The ESF is used to, among other things, identify the potential for impacts to park resources and potential issues stemming from the proposed action. The ESF is not itself a NEPA document. It is unclear why the NPS uses ESF forms in conjunction with CEs, which by nature are actions that have previously been identified as not having significant environmental impacts and thus do not require additional scrutiny. Any findings of potential impacts on an ESF prepared in conjunction with a CE indicates that a CE likely is not appropriate for the proposed action.

69.     The Biomass Removal Project's CE Form authorizes logging and removal of trees up to 20" in diameter in the Merced Grove of Sequoias, despite that same document acknowledging that the 2004 Fire Management Plan only allows for removal of conifers <12" in diameter in sequoia groves. A CE Form may only document the use of an appropriate CE, but may not itself authorize action that falls outside of that CE's purview. The NPS's reliance upon its Biomass Removal Project CE Form to authorize the logging of trees up to 20" in diameter within the Merced Grove of Sequoias is a violation of the 2004 FMP, is arbitrary and capricious and in violation of NEPA and the APA, 5 U.S.C. § 706(2)(A).

70.     The Biomass Removal Project's CE Form authorizes logging along roads and trails "200 feet from centerline on both side of the road unless otherwise noted." CE Form at 1. Unlike the logging occurring within the sequoia grove, CE Form does not clearly specify the size of trees which will be removed for this road-side logging. It is possible that this logging includes trees up to 20" in diameter as well, and photos taken of the active Project site indicate this is the case. While Plaintiff still does not have access to a copy of the 2004 FMP or the 2004 FMP EIS, Plaintiff was able to obtain from the Yosemite Project Planning website a copy of errata sheets for the 2017 Fire Plan Amendment. Those limited documents include, in comparative form, changes between the 2004 FMP and the 2017 Amendment, for limited portions of the Plan. These documents indicate that the Park is divided into two fire management units – the Community and Infrastructure Protection Unit (1% of the Park), and the Wildland Fire Management Unit (99% of the Park). NPS maps identifying unit boundaries indicate that the Protection Unit is comprised of developed areas, and appears to exclude the Biomass Removal Project area. Therefore the Project is within the Wildland Fire Management Unit. Two management prescriptions are shown for this

1  unit: "Non-Wildland/Urban Interface, Non-Wilderness" and "Wilderness." The CE Form

2  indicates that "no work will occur in Wilderness[,]" CE Form at 1, therefore the Non-

3  Wildland/Urban Interface, Non-Wilderness management prescription applies. That prescription

4  only allows for "[p]rescribed fire and thinning of small trees generally less than 6" dbh [diameter

5  at breast height] would be done to protect these areas as a . . . wildfire approaches." 2017

6  Amendment Errata Sheet – Chapter 2, at 11. Accordingly, logging of trees >6" dbh in the Project

7  area is not permitted by the FMP, as amended. To the extent that the NPS has approved, via its

8  CE Form, logging of trees >6" dbh along roads and trails in the Project area, that decision and

9  authorization is arbitrary and capricious and in violation of NEPA and the APA, 5 U.S.C. §

10  706(2)(A).

11      71.     The Biomass Removal Project's CE Form authorizes additional actions that the CE

12  Form acknowledges were not contemplated by, and thus not analyzed in, the 2004 FMP. This

13  includes the off-road use of tracked equipment to haul biomass ("*FMP does not specify if

14  tracked equipment is permitted along road corridors." CE Form at 1); road-side thinning on South

15  Side Drive ("*FMP does not specify roadside thinning on south side drive." CE Form at 2); and

16  expanding the "200 feet from centerline on both side of the road" corridor beyond what is

17  allowed in the FMP ("The following two road segments expand what is prescribed in the FMP."

18  CE Form at 2). These are admissions that the described actions were not included in, and thus not

19  analyzed by, the 2004 FMP. The CE Form may only document the use of an appropriate CE. The

20  CE Form itself may not be used to otherwise analyze or justify these "additional" actions – this

21  analysis must occur in an EA or EIS. To the extent that the NPS purports to authorize, via its CE

22  Form, actions that extend beyond actions authorized and analyzed in the 2004 FMP, that decision

23  and authorization is arbitrary and capricious and in violation of NEPA and the APA, 5 U.S.C. §

24  706(2)(A).

**COUNT THREE**

**(Improper tiering to outdated NEPA document)**

27      72.     Although NPS purports to "tier" to the 2004 Fire Management Plan, it appears to

28  misconstrue the nature of tiering under NEPA. To tier is when a narrower NEPA analysis

document points to a broader NEPA analysis document to show that the relevant analysis has already been completed and thus need not be revisited. Tiering, by nature, involves facts and analyses that the two documents have *in common*, with one NEPA document focusing on the broader/programmatic impacts, while the other NEPA document provides analysis of site-specific impacts. The Biomass Removal Project's CE Form appears to contemplate the opposite. It first states that Project actions "tier off the FMP[,]" and then that "[t]iered actions are specifically called out with an explanation of how it differs from FMP." CE Form at 1. Tiered actions cannot "differ" from the document tiered to - this is the opposite of what NEPA contemplates.

73.     To the extent that NPS purports to "tier" to the 2004 FMP for Project actions that *differ* from the 2004 FMP in order to authorize Project actions that do not fit within the stated CE, doing so is arbitrary and capricious and in violation of NEPA and the APA, 5 U.S.C. § 706(2)(A).

74.     To the extent that the NPS purports to "tier" to the 2004 FMP for Project actions that *may actually be analyzed* in the 2004 FMP in order to authorize Project actions that do not fit within the stated CE, doing so is arbitrary and capricious and in violation of NEPA and the APA, 5 U.S.C. § 706(2)(A), because the NPS itself has stated that the 2004 FMP is out of date and no longer accurately reflects or responds to on-the-ground conditions. *See* CE Form at 2 ("FMP calls for removal of conifers <12" diameter in sequoia groves. It has been 17 years since the FMP was written. Tree density far surpasses the on the ground conditions and removal of 12" diameter trees is insufficient to protect the sequoias.")

75.     Alternatively, even if the 2004 FMP may properly be tiered to, NEPA does not contemplate categorically excluded actions tiering to other NEPA documents. *See* 40 C.F.R. § 1501.11. Even if a CE *could* tier to another NEPA document, the CE Form is not itself a CE. Further, even it was, the NPS did not follow the requisite procedures to properly tier to the 2004 FMP in the first place. 40 C.F.R. § 1501.11(b); 43 C.F.R. § 46.140. The CE Form does not summarize what issues are discussed in the broader document; address relevant analysis from the FMP; or identify where the analysis in the FMP does not sufficiently support further decisions. To the extent that the NPS authorized Biomass Removal Project activities under improperly "tiered" documents, that authorization was arbitrary and capricious, an abuse of discretion, and in

20   COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

1    violation of NEPA, the DOI's NEPA-implementing regulations, and the APA, 5 U.S.C. §

2    706(2)(A).

3

4                         **CLAIM 2**

5            **(Violation of the NPS Organic Act and the APA)**

6        76.     Plaintiff realleges and incorporates by reference all preceding paragraphs into the

7    claim set forth below.

8        77.     The NPS's approval of logging and other biomass removal activities in violation

9    of approved park management plans is resulting in the impairment of Park resources. The Project

10    is resulting in the removal of trees of up to at least 20" in diamter – Park resources that will take

11    decades to regenerate. Doing so fails "to conserve the scenery, natural and historic objects, and

12    wild life in the System units and to provide for the enjoyment of the scenery, natural and historic

13    objects, and wild life in such manner and by such means as will leave them unimpaired for the

14    enjoyment of future generations[,]" in violation of 54 U.S.C. § 100101(a).

15        78.     Further, such actions violate the NPS mandate that "[t]he authorization of

16    activities shall be construed and the protection, management, and administration of the System

17    units shall be conducted in light of the high public value and integrity of the System and shall not

18    be exercised in derogation of the values and purposes for which the System units have been

19    established, except as directly and specifically provided by Congress." 54 U.S.C. § 100101(b)(2).

20        79.     The NPS's violation of the Congressionally mandated non-impairment standard is

21    arbitrary and capricious, an abuse of discretion, and not in accordance with the law, in violation

22    of the APA, 5 U.S.C. § 706(2)(A).

23

24                      **PRAYER FOR RELIEF**

25        WHEREFORE, Plaintiff respectfully requests that the Court:

26             A.     Declare that the NPS's CE Form for the Biomass Removal Project violates

27    NEPA and the NPS Organic Act and is arbitrary, capricious, an abuse of discretion, and/or not in

28    accordance with the law under the APA, 5 U.S.C. § 706(2)(A), or in the alternative declare that

1  NPS's use of the CE Form to authorize Project activities was "without observance of procedure

2  required by law" in violation of 5 U.S.C. § 706(2)(d);

3         B.      Vacate and set aside the CE Form for the Biomass Removal Project as

4  illegal agency action under the APA;

5         C.      Preliminarily and permanently enjoin the NPS from implementing the

6  Biomass Removal Project until the agency has complied with NEPA and the NPS Organic Act;

7         D.      Enter appropriate injunctive relief to ensure that Defendants comply with

8  NEPA and the NPS Organic Act, and specifically to ensure that Defendants and their agents take

9  no further actions toward proceeding with the challenged Biomass Removal Project until they

10  have complied with NEPA and the Organic Act;

11         E.      Award Plaintiff its reasonable costs, litigation expenses, and attorneys' fees

12  associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et

13  seq.*; and

14         F.      Grant such further relief as the Court deems just and proper.

15

16     Respectfully submitted on this 13th day of June, 2022.

17

18                                    /s/ Thomas Buchele
                                     Thomas Buchele, CA Bar No.129657
19                                    Bridgett Buss (*Pro Hac Vice* application to be filed)
                                     Earthrise Law Center
20                                    Lewis & Clark Law School
                                     10101 S. Terwilliger Blvd.
21                                    Portland OR  97219-7799
                                     Tel: 503-768-6736 (Buchele)
22                                    Tel: 503-768-6825 (Buss)
                                     Email: tbuchele@lclark.edu
23                                    Email: bridgettbuss@lclark.edu

24
                                     *Attorneys for Plaintiff Earth Island Institute*
25

26

27

28