1
2
3
4
5

**UNITED STATES DISTRICT COURT**

6

**EASTERN DISTRICT OF CALIFORNIA**

7
8

**EARTH ISLAND INSTITUTE, a non-profit corporation,**

9

**CASE NO. 1:22-CV-00710-AWI-EPG**

**Plaintiff,**

10

**ORDER RE: PLAINTIFF'S AMENDED MOTION FOR PRELIMINARY INJUNCTION**

**v.**

11
12

**CICELY MULDOON, in her official capacity as Superintendent of Yosemite National Park; UNITED STATES PARK SERVICE, an agency of the United States Department of the Interior; UNITED STATES DEPARTMENT OF THE INTERIOR,**

**(Doc. Nos. 22, 52, and 69)**

13
14
15
16

**Defendants**

17

## I. FACTUAL BACKGROUND

18

### A. The Projects

19

Defendants National Park Service ("NPS"), Department of the Interior ("DOI"), and

20

Cicely Muldoon, in her official capacity as Yosemite Park Superintendent (collectively

21

"Defendants"), approved two biomass removal and thinning projects in Yosemite National Park:[1]

22

(1) the Biomass Removal and Thinning to Protect Sequoias, Wildlife Habitat and Communities

23

Project – Wawona Road to Merced Grove (PEPC 99551) (the "Wawona Road Project"), signed in

24

August 2021; and (2) the Biomass Removal and Thinning Project – Yosemite Valley, Wawona,

25

and Yosemite West (PEPC 104171) (the "Yosemite Valley Project"), signed in April of 2022,

26

(collectively the "Projects").  Doc. No. 23 at 9.  The Projects authorize removal of some dead and

27
28

---

[1] "Thinning" is a tactic used to manage fires by removing some trees from an area to create more space and less flammable material between the remaining trees.  Doc. No. 38 at 17 n.8.

down trees and thinning of some trees across over three-thousand acres of land to "reduce post-drought and post-fire fuels" and to "protect [the treated areas] from high severity fire." Doc. No. 23 at 14-15; Doc. No. 38 at 23.  Additionally, the Projects authorize thinning of some roadside trees outside designated wilderness areas that are generally within 200 feet of the centerline of roads.  Doc. No. 38 at 23.  The objectives of the Projects are to protect the iconic Merced and Tuolumne Groves of Giant Sequoias, the Park's wildlife and other resources, and the communities and first responders within the park from the risk of high-severity fires.  Doc. No. 38 at 12, 22.

The Wawona Road Project specifically seeks to protect Wawona Road and Big Oak Flat Road, which are two of the major roads in and out of Yosemite Valley.  Doc. No. 38 at 22.  These roads are the only major features that can be used for fire control in the Park's lower elevations, given that any fire that crosses either road is likely to continue unabated until either it hits the granite at higher elevations, or sufficient bulldozer lines are cut through the Park's wilderness. Doc. No. 38 at 22-23.

The focus of the Yosemite Valley Project is to protect the populated areas within Yosemite Valley, Yosemite West, and Wawona.  Doc. No. 38 at 23.  Additionally, this project aims to restore meadows and black oak woodlands in the western half of Yosemite Valley by using fuel-reduction treatments.  Doc. No. 38 at 23.  The project also covers 11-mile road, which runs along the southern side of, and can provide emergency access to, Yosemite West.  Doc. No. 38 at 23.

**B. The Projects' Relationship with Approved Plans**

Defendants approved the Projects using a "categorical exclusion" ("CE"), which is a measure that generally exempts proposed federal actions from additional analysis under the National Environmental Policy Act ("NEPA").  Doc. No. 23 at 10.  NEPA generally requires federal agencies to assess the environmental effects of their proposed actions, such as by preparing an Environmental Impact Statement ("EIS"), prior to making decisions on whether to implement those actions.  The CE used by Defendants to exempt the Projects from additional NEPA review is CE 3.3.B.1, which categorically excludes "[c]hanges or amendments to an approved plan, when such changes would cause no or only minimal environmental impact."  Doc. No. 23 at 10.

1  The "approved plan" that the Projects purport to "change or amend" is the Park's 2004 Fire

2  Management Plan ("2004 FMP").  Doc. No. 23 at 15-16.  Yosemite National Park adopted the

3  2004 FMP to guide its implementation of complex fire management programs to reduce the threat

4  of wildland fire.[2]  Doc. No. 38 at 17.  The 2004 FMP included an EIS that analyzed alternatives

5  for carrying out fire management plans in Yosemite and the effects each would have in different

6  areas of the park.  Doc. No. 23 at 10.  The 2004 FMP Record of Decision approved a management

7  scheme involving two primary management designations: (1) "Suppression Units" making up 17%

8  of the Park where all wildfires would be immediately suppressed, and (2) "Fire Use Units" making

9  up 83% of the Park where wildfire would be used to manage ecological conditions.  Doc. No. 23

10  at 16-17; Doc. No. 38 at 17.  The FMP's management scheme also involves "Special Management

11  Areas" located within these two designations.  Doc. No. 23 at 16.

12       The 2004 FMP's Suppression Units and Fire Use Units contain three sub-categories with

13  different management prescriptions: (1) Wildland/Urban Interface ("WUI"), (2) Non-

14  Wildland/Urban Interface, Non-Wilderness (NWUI), and (3) Wilderness.  Doc. No. 23 at 16-17.

15  Within the Suppression Units, WUI trees up to 12 inches in diameter may be thinned, and NWUI

16  trees less than 20 inches in diameter may be cut in certain limited areas.[3]  Doc. No. 23 at 17.

17  Within the Fire Use Units, the 2004 FMP authorizes thinning of NWUI trees "generally less than"

18  6 inches in diameter "to protect these areas as a wildland fire approaches."  Doc. No. 23 at 17.

19  Within the "Special Management Area" of the Merced Grove, trees less than 12 inches in diameter

20

21  [2] The stated purposes of the FMP are as follows:

22       • Identify and implement methods to restore and maintain park ecosystems and ecosystem processes that allow
          fire to play its natural role in the ecosystem, both as wildland fire and prescribed fire.

23       • Reduce the risk of fire to cultural resources (i.e., historic buildings, pictographs) through fuels reduction,
          prescribed burning, or fire suppression to prevent fires from damaging cultural resources. Fire will also be
          used as a tool to manage cultural landscapes.

24       • Reduce the risk of catastrophic fire, including near the wildland/urban interface (communities, government
          and commercial buildings, and other developed areas), while continuing to reverse the adverse effects from

25       past fire suppression and prevention activities.
         • Execute a fire management program that provides a safe environment for firefighters and the public,

26       including safe operations and fire management related facilities (e.g., helibases, fire camps, fire stations).
         • Provide a plan that is consistent with National Park Service wildland fire management policy and adheres to

27       guiding principles from the 2001 Federal Fire Policy.
     Doc. No. 29 at 34-35; Doc. No. 31-1 at 3.

28  [3] Specifically, in NWUI areas, passive thinning of trees less than 20 inches in diameter is permitted within 200 feet of
     the centerline of roads and under utility lines where canopies are closely packed.  Doc. No. 39-4 at 40.

1    may be logged.  Doc. No. 23 at 17.

2          The 2004 FMP also requires mitigation measures to be imposed on all projects performed

3    pursuant to the Plan, including specific measures for protection of sensitive species including the

4    Pacific fisher and California Spotted Owl.  Doc. No. 38 at 18.  Whenever the NPS looks to

5    implement a project identified in the FMP with actions not specifically covered by the FMP's EIS,

6    the FMP directs the NPS to "prepare appropriate environmental review for those actions."  Doc.

7    No. 38 at 18.

8          In 2017, the NPS adopted amendments to the 2004 FMP ("2017 FMP") that, among other

9    amendments, renamed "Suppression Units" as "Community and Infrastructure Protection Strategy

10   Units," and renamed "Fire Use Units" as "Wildland Fire Management Units."  Doc. No. 23 at 17.

11   The 2017 FMP also amended the division of land between the units such that the

12   Suppression/Community and Infrastructure Protection Strategy Units decreased from 17% to 1%

13   of the Park, and the Fire Use/Wildland Fire Management Units increased from 83% to 99%.  Doc.

14   No. 23 at 17; Doc. No. 38 at 19. According to Plaintiff, a "large majority of the acreage" covered

15   by the Wawona Road Project and a "significant portion" of the Yosemite Valley Project now fall

16   within the "Fire Use Unit/Wildfire Management Unit" designation.  Doc. No. 23 at 17-18.

17         The 2017 FMP did not expressly change the management requirements or designations for

18   Special Management Areas.  Doc. No. 23 at 17 n.9.  Therefore, trees less than 12 inches in

19   diameter may still be logged in Merced Grove.  Doc. No. 23 at 17 n.9.  Additionally, the 2017

20   FMP did not amend the 2004 FMP's authority to thin NWUI trees less than 20 inches in diameter

21   in Suppression/Community and Infrastructure Protection Strategy Units within 200 feet of the

22   centerline of roads.  Doc. No. 38 at 18-19; Doc. No. 44-1 at 11.  The 2017 FMP also did not

23   amend the authority to thin NWUI trees generally less than 6 inches in diameter in Fire

24   Use/Wildland Fire Management Units "to protect these areas as a wildland fire approaches."  Doc.

25   No. 44-1 at 12.

26

27   **C. The Projects' "Additions" to Approved Plans**

28         The Wawona Road Project's CE Form states that it "follows" the 2004 FMP's EIS, but

4

that there are "several additions" that extend beyond the scope of the 2004 FMP.  Doc. No. 23 at 15.  Notably, the project added a short road segment not identified in the 2004 FMP, expanded the width of the roadside corridors to as far as 209 feet from the road centerline in some areas, and increased the size of trees that may be logged from 12 inches in diameter to 20 inches in diameter in designated areas including Merced Grove.  Doc. No. 23 at 15; Doc. No. 38 at 24.  According to NPS, the Wawana Road Project is also "generally covered by" the 2017 FMP.  Doc. No. 23 at 15; Doc. No. 38-5 at 7.

The Yosemite Valley Project's CE Form similarly states it "follows" the 2004 FMP and EIS, but that there are "several additions" that will "expand and tier" from those authorities.  Doc. No. 23 at 16.  For example, the NPS admits that some of the areas where work will occur in the West Yosemite Valley is "not currently covered by" the 2004 FMP's EIS.  Doc. No. 23 at 16.  The project also includes minor modifications of the meadow and black oak woodland thinning projects identified in the Merced River Plan (MRP), which the project also purports to follow.  Doc. No. 38 at 24.  According to the NPS, the Yosemite Valley Project is also "generally covered by" the 2017 FMP.  Doc. No. 23 at 16; Doc. No. 38-6 at 8.

Because the Projects do not strictly conform to the FMPs (and MRP), the NPS allegedly evaluated whether the Projects' "additions" met the impact assessment requirements of CE 3.3.B.1.  Doc. No. 38 at 24.  The NPS's evaluation consisted of the following:

1. "[A] survey along the Projects' roads by wildlife biologists, botanists, and archeologists," Doc. No. 38 at 24;

2. "[A] forum where subject matter experts reviewed the Projects and their possible impacts" and "concluded that there would be no more than minimal impact," Doc. No. 38 at 24-25;

3. "[I]nput on the Projects from outside stakeholders, including the seven affiliated tribes, and the State Historic Preservation Officer, all of whom supported the projects," Doc. No. 38 at 25;

4. A "review[] by the Park's heads of each division to ensure that they would not impact other park operations," Doc. No. 38 at 25;

5. A "consultation with the Fish and Wildlife Service" which concluded that the Projects were "not likely to adversely affect the fisher," Doc. No. 38 at 26;

6. "[A] Biological Opinion ("BiOp")" that concluded that the impacts of the Projects to the Frog and its habitat would will be minimal" and ultimately "benefi[cial] to the species," Doc. No. 38 at 27;

7. An assessment resulting in a conclusion that the presence of the Pacific fisher and California red-legged frog did not constitute "extraordinary circumstances" precluding the use of a CE for the Yosemite Valley Project, Doc. No. 38 at 28;

8. A consideration and incorporation of mitigation measures, such as the "standard erosion control, prevention, and rehabilitation measures outlined in the Yosemite Fire Management Plan ROD," "protections for fisher dens identified in the FMP," "limitations on the periods of the year when work on the Projects can occur to avoid disturbing fisher denning," and "requirements to preserve habitat structure such as including leaving trees with certain characteristics (e.g., suitability for fisher denning) and retaining all trees over 20" diameter and all California black oaks," Doc. No. 38 at 25; and

9. Positive feedback for the Projects from "prominent environmental organizations, local organizations and leading academics in Forest Policy," including the Central Sierra Environmental Resource Center, National Parks Conservation Association, American Forests, Yosemite West Property & Homeowners, Inc., and two Professors from University of California, Berkeley. Doc. No. 38 at 28.

**D. Plaintiff's Discovery of the Projects and Initiation of Lawsuit**

Plaintiff Earth Island Institute ("EII") discovered Defendants logging trees pursuant to the Projects when one of its members observed trucks loaded with fresh timber driving through the Park.  Doc. No. 23 at 11.  After speaking with NPS officials and reviewing the NPS's website, Plaintiff filed a Complaint on June 13, 2022, and thereafter filed a Motion for Preliminary Injunction on June 15, 2022, seeking to enjoin most of the logging authorized by the Wawona Road Project.  Doc. Nos. 1 and 6.  After speaking again with NPS officials and reviewing the

Projects' CE forms, Plaintiff filed a First Amended Complaint on July 7, 2022 and an Amended Motion for Preliminary Injunction on July 14, 2022, seeking to enjoin both Projects.  Doc. Nos. 21 and 22.  The Parties negotiated limitations on the implementation of both Projects while awaiting the Court's decision on Plaintiff's amended motion.  Doc. No. 23 at 12.  Specifically, the parties agreed that (1) the Wawona Road Project will be limited to rehabilitation work along Merced Grove Road, and that no trees will be cut during this work, and (2) the Yosemite Valley Project will be limited to work within the Community and Infrastructure Protection Strategy ("CIPS") Units created by the 2017 FMP Amendments.  Doc. No. 20 at 1-2; Doc. No. 23 at 13.

## II. LEGAL STANDARDS

Federal Rule of Civil Procedure 65 governs preliminary injunctions and temporary restraining orders.  The substantive standard for issuing a temporary restraining order and a preliminary injunction are "substantially identical." Kindred v. Bigot, 727 F. App'x 427, 427 (9th Cir. 2018) (citing Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 839 n.7 (9th Cir. 2001)).  A plaintiff seeking a preliminary injunction must establish: (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  "We evaluate these factors via a 'sliding scale approach,' such that 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest.'" Arc of Cal. v. Douglas, 757 F.3d 975, 983 (9th Cir. 2014) (quoting Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 and 1135 (9th Cir. 2011)).  "Injunctive relief...must be tailored to remedy the specific harm alleged." Park Vill. Apt. Tenants Ass'n v. Mortimer Howard Trust, 636 F.3d 1150, 1160 (9th Cir. 2011).

## III. DISCUSSION

There is some dispute over the proper standard in this motion.  While the likelihood of

success on the merits is generally the first requirement, "if a plaintiff can only show that there are

'serious questions going to the merits' — a lesser showing than likelihood of success on the merits

— then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the

plaintiff's favor,' and the other two Winter factors are satisfied." Shell Offshore, Inc. v.

Greenpeace, Inc., 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting All. For The Wild Rockies v.

Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011)).  Plaintiff directly claims that "The Balance of

Hardships Tips Sharply in Favor of Plaintiff." Doc. No. 23 at 44.  In contrast, Defendants assert

that "The Balance of Equities and Public Interest Tip Sharply in Favor of Defendants." Doc. No.

38 at 62.  Defendants add that when the government is a party in a suit (as is the case here), the

balance of the equities and the public interest considerations merge. Drakes Bay Oyster Co. v.

Jewell, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing Nken v. Holder, 556 U.S. 418, 435 (2009)).

Given the complexity of the merits analysis, firmly determining the appropriate standard

beforehand would be helpful.  Thus, the preliminary injunction test will be examined out of the

ordinary order.  The question of irreparable injury will be taken up first, balance of equities/public

interest second, and the examination of the merits last.

## A. Irreparable Injury

Plaintiff asserts two forms of irreparable injury.  One is that "Declarant Hanson and EII's

procedural rights have also been irreparably harmed by their inability to participate in the NEPA

process because the NPS improperly used a categorical exclusion for the Projects and did not

allow them to comment or participate in any way in the NPS's decision-making process." Doc.

No. 23, 35:3-6.  Defendants correctly point out that the idea of a procedural injury in this context,

standing alone, constituting irreparable harm has not been accepted by the courts. Save Our

Sonoran, Inc. v. Flowers, 408 F.3d 1113, 1124 (9th Cir. 2005) ("there is no presumption of

irreparable harm in procedural violations of environmental statutes"); Native Songbird Care &

Conservation v. Lahood, 2013 U.S. Dist. LEXIS 93120, at *42 (N.D. Cal. July 2, 2013) ("If

Plaintiffs assert that a 'procedural' injury suffices to grant plaintiffs irreparable harm even in the

absence of a threat to a species, it would seem that anyone challenging an agency's failure to

prepare an EIS or a Supplemental EIS (or, indeed, to take any action allegedly required by NEPA) would automatically satisfy one fourth of the requirements for achieving a preliminary injunction. It is doubtful that this is the rule of this circuit"); Conservation Cong. v. United States Forest Serv., 2016 U.S. Dist. LEXIS 152865, at *18 (E.D. Cal. Nov. 2, 2016) ("A NEPA violation, without more, does not establish the requisite likelihood of irreparable harm").

Plaintiff summarizes the other assertion of harm as: "The approved logging, thinning, and biomass removal would negatively affect the wildlife viewing opportunities in the area, will harm EII's supporters' ability to view and utilize the area in its undisturbed state and will impede the aesthetic, professional, and recreational use and enjoyment of Yosemite Valley." Doc. No. 23 at 42.  The focus is not on the impact on wildlife, but rather the ability of visitors to enjoy the wilderness.

The Ninth Circuit has directly stated that logging which interferes with the ability to "'view, experience, and utilize' the areas in their undisturbed state" does constitute irreparable harm. All. For The Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011) (reversing district court's denial of preliminary injunction).  In that case, the Ninth Circuit stated "The Project will prevent the use and enjoyment by AWR members of 1,652 acres of the forest. This is hardly a de minimus injury." Id.  Those 1,652 acres had already been burned and the logging project was to cut trees of all species that were "4 to 15 inches in diameter at breast height ('dbh') that have died or are likely to die as a direct result of fire or insect attack…. Trees that survived the fire but are infected with dwarf mistletoe are to be cut, regardless of size, unless doing so would reduce the number of live trees below the Forest Service's wildlife habitat standard. Uninfested live trees, including those with a dbh larger than 15 inches, are to be cut only if required by safety concerns." Id. at 1129.  The Projects in this case involve cutting of trees with a diameter of up to 20 inches, which is somewhat comparable.  "The logging of mature trees, if indeed incorrect in law, cannot be remedied easily if at all. Neither the planting of new seedlings nor the paying of money damages can normally remedy such damage. The harm here, as with many instances of this kind of harm, is irreparable for the purposes of the preliminary injunction analysis." League of Wilderness Defs./Blue Mts. Biodiversity Project v. Connaughton, 752 F.3d

1   755, 764 (9th Cir. 2014) (reversing district court's denial of preliminary injunction).

2          Defendants argue a lack of irreparable harm from logging, relying on the principle that

3   "timber cutting is not inherently damaging to forests and irreparable harm does not automatically

4   arise from all environmental impacts caused by logging." Friends of the Wild Swan v. Weber, 955

5   F. Supp. 2d 1191, 1195 (D. Mont. 2013).  In that case, the harm alleged "pertains to their

6   recreational enjoyment of mature and old growth forest stands." Id.  But, the District of Montana

7   came to its conclusion based on the finding that the project to be enjoined "does not treat old

8   growth stands so it is difficult to see how its activities will irreparably harm Plaintiffs' alleged

9   interests." Id.  More directly on point is an Eastern District of Washington case which found that

10  plaintiff's "interest in viewing an 'undisturbed' landscape" was insufficient to establish a

11  likelihood of irreparable harm as it was "too speculative to demonstrate a concrete and

12  particularized harm that creates an irreparable injury… Moreover, despite the fact that certain trees

13  will be permanently removed, logging is not per se an irreparable harm requiring an injunction."

14  All. For The Wild Rockies v. Pena, 2016 U.S. Dist. LEXIS 144961, at *7-8 (E.D. Wash. Oct. 19,

15  2016) (citing Earth Island Inst. v. Carlton, 626 F.3d 462, 474 (9th Cir. 2010)).  On appeal, the

16  Ninth Circuit affirmed the denial of preliminary injunction on the basis that there was no

17  likelihood of success on the merits without addressing the issue of irreparable harm. All. for the

18  Wild Rockies v. Pena, 865 F.3d 1211, 1223 (9th Cir. 2017).

19         Based on the framing of the alleged harm, the precedent supports Plaintiff's position.

20  Plaintiff has established a likelihood of irreparable harm absent an injunction.

21

22  **B. Balance of Equities and Public Interest**

23         In looking at the balance of equities and public interest, Plaintiff emphasizes that the

24  analysis should cover "only the portion of the harm that would occur while the preliminary

25  injunction is in place." Doc. No. 23 at 44.  That is, Plaintiff focuses on the impact of temporarily

26  halting the implementation of the Projects outside the CIPS Units, the logging of trees between 6

27  and 20 inches in diameter (12 and 20 inches in within the Merced Grove), and the removal of any

28  hazard trees after it has been felled. Doc. No. 22-1 at 3.  Plaintiff offers the irreparable harm it has

10

established above, that of limiting the ability of visitors to enjoy the wilderness.  Defendants counter that the Projects are needed to "(1) make it easier to fight fires which improves public safety and protects property; (2) protect the Park's Giant Sequoias; and (3) protect the Park's listed wildlife species and cultural resources from the risk of catastrophic fire." Doc. No. 38 at 63.  In sum, Defendants argue that the Projects are needed now to mitigate the danger of forest fires which has become an extreme risk in recent years.

Substantively, Plaintiff largely relies on Ninth Circuit precedent in *League of Wilderness Defs./Blue Mts. Biodiversity Project v. Connaughton*, 752 F.3d 755 (9th Cir. 2014) to discuss weighing the interests.  In that case, the plaintiffs sought a preliminary injunction against a logging project on federal land. Id. at 758-59.  In evaluating the balance of hardships/public interest, the environmental damage that would ensue absent an injunction was the "logging of thousands of mature trees. The logging of mature trees, if indeed incorrect in law, cannot be remedied easily if at all. Neither the planting of new seedlings nor the paying of money damages can normally remedy such damage. The harm here, as with many instances of this kind of harm, is irreparable for the purposes of the preliminary injunction analysis." Id. at 764.  The interests that weighed against granting the preliminary injunction were economic (loss of logging jobs and revenue). Id. at 765.  Further, the economic harm was not a permanent loss but only a delay of jobs and revenue if the injunction were ultimately reversed as part of a resolution of the full case. Id.  Given those facts, the Ninth Circuit found that the "irreparable environmental injuries outweigh the temporary delay intervenors face in receiving a part of the economic benefits of the project." Id.

The Ninth Circuit has recognized that valid public interest concerns include "decreas[ing] the risk of catastrophic fire, insect infestation, and disease." Lands Council v. McNair, 537 F.3d 981, 1005 (9th Cir. 2008).  Plaintiff recognized that as the present motion was being initially briefed, the Washburn Fire was "burning in Yosemite National Park near or within the Mariposa Sequoia Grove." Doc. No. 23 at 45 n.22.  However, Plaintiff noted that

> *Connaughton* did recognize that mitigating fire and insect risks is relevant to the required balancing of interests, even if they are somewhat speculative. However, that same opinion went on to explain that such risks were only entitled to 'great weight' when they were both imminent and unable to be mitigated while a preliminary injunction was in place.

1    Doc. No. 23 at 44 (citing <u>League of Wilderness Defs./Blue Mts. Biodiversity Project v.</u>

2    <u>Connaughton</u>, 752 F.3d 755, 766 (9th Cir. 2014)).  In that case, the Ninth Circuit noted that the

3    evidence showed no increased risk of fire if an injunction was granted because the relevant

4    Environmental Impact Statement in that case specifically said that "[f]ire suppression can be

5    expected to continue and be highly successful" even without implementing the proposed project.

6    <u>Id</u>.

7         The facts of this case are distinctly different from that of *Connaughton*.  Garret Dickman, a

8    Yosemite National Park forest ecologist, explains that

9
        Implementation of the FMP in the past decade has been slowed because the hottest
        and driest drought in 1,200 years began in 2012 and continued into 2016, killing
10         millions of trees in the Sierra Nevada

11         ….

12         High live tree density and high density of dead biomass creates a situation that
        makes it extraordinarily difficult for firefighters to engage and leads to large, sever
13         wildfires like the 2020 Creek Fire, which nearly entered Yosemite from the
        neighboring Sierra National Forest….necessitating the dramatic helicopter rescue
14         of 214 people trapped by the fire.

15    Doc. No. 38-1 at 11-13.  Nicole Athearn, the Yosemite National Park Division Chief for

16    Resources Management and Science, states "An analysis of weather and fuel-related variables

17    suggests that 2020 was not an anomaly but part of a more than 20-year trend of larger, more

18    intense fires in California, underscoring the urgent need for fuels reduction to reduce the

19    immediate threat." Doc. No. 38-3 at 5.  Defendants' submissions support a conclusion that there is

20    a serious threat of wildfire.

21         The CE Forms explicitly state that the purpose of the Projects are, in part, to "improve[]

22    safety for the public and first responders" and a mechanism for accomplishing this goal is

23    "hardening roads and houses through biomass removal." Doc. No. 27-2 at 6-7; Doc. No. 27-4 at 5.

24    Defendants provide the declaration of Daniel Thomas Buckley, Branch Chief of Fire and Aviation

25    Management in Yosemite National Park who states:

26         The Wawona Road project is primarily addressed to road corridors and the
        Yosemite Valley Project includes thinning along 11-mile road. Treatment of road
27         corridors is critical for fire management in a number of ways. Reduced fuel loads
        along roads help ensure the roads can be used be used by fire fighters as anchor
28         points (areas which give firefighters advantageous position, usually a barrier to fire

1
2
3
4
5

spread, from which to start constructing a fireline) and control lines (also known as 'firelines,' these are lines devoid of burnable fuels to allow control of the fire by stopping its spread) as control lines, evacuation routes and travel routes for firefighters. Roadways in Yosemite are often last line of defense; if a fire gets past roads in the park it will enter wilderness where fighting it is even more difficult because of the lack of access for firefighters, fire engines and other mechanized apparatus. Increased travel times allow the fires to get larger. Treated roads also allow critical access routes for fire fighters heading to the fire and for residents and tourists evacuating away from a fire.

6   Doc. No. 38-2 at 21-22.  Additionally, "Reductions in fire intensity increase human safety and

7   allow for more effective firefighting in the wildland-urban interface. Most years at least one of the

8   Park's communities is evacuated and homes have been lost due to past wildfires. The 2022

9   Washburn Fire caused the evacuation of the Wawona community for 10 days. Fires in areas where

10  fuels have not been treated support extreme fire behavior that has and can lead to the loss of

11  human life." Doc. No. 38-2 at 25.  "In 2018, the Ferguson Fire came within a mile of Yosemite

12  Valley and burned over all three roads entering and exiting the Valley; two of those roads are part

13  of the Wawona Road Project. The Park was closed because of the fire, but had fire entered

14  Yosemite Valley when it was open, not only would there have been incredible damage to natural,

15  cultural, and historical resources and manmade infrastructure, but thousands of people would have

16  been trapped or far worse." Doc. No. 38-1 at 11.

17
18
19
20
21

These Projects support the Big Oak Flat and Wawona road corridors, which along with other roads in the Park are critical for managing fire and emergency ingress/egress in several ways: (a) they connect the communities of Wawona, Yosemite West, and Yosemite Valley to the outside world; (b) during a fire, fire-fighters and first responders need to access the fire or communities; (c) visitors and community members need to be able to evacuate rapidly and safely in the event of fire; (d) these roads are the only major features that can be used for managing wildfires in lower elevations.

22  Doc. No. 38-1 at 18.  These stated aims are consistent with the design of the Projects, which seek

23  to clear trees within 200 feet of the existing road system.  "In short, thinning alongside a road,

24  standing alone, will not necessarily stop a high severity fire. But thinning will give firefighters a

25  safe space from which to fight the fire." Doc. No. 65 at 12.

26      Much of the dispute centers on the cutting of trees between either 6 and 20 inches or 12

27  and 20 inches in diameter and whether those cut trees should then be left in place.  Regarding the

28  necessity of removing larger trees, Defendants explain that

> Sustained drought and bark beetle infestation in the Sierra Nevada since 2013 have left vast swaths of dead standing snags with an unnatural buildup of dead and live fuels under mature canopy. This condition aids in the propagation of crown fires, which occurs when fire advances from the ground to the tops of trees or shrubs independent of a surface fire. Crown fires are the most difficult form of wildfire to control and are extremely dangerous for firefighters to engage safely without the support of bulldozers and aircraft. Crown fires occur in Sierra Nevada forests when the amount of both live and dead fuels under the larger trees generate enough heat for the fires to climb up smaller trees and lower limbs into the upper portion of the trees. Crown fires are sustained when the tree canopies are closer than twenty feet, which is why the thinning of trees is important to protect the larger trees, including giant sequoias. Smaller trees serve as ladders for the fire to climb from the ground into the tree tops.

Doc. No. 38-2 at 5.  "Conifers of any species <20" have ladder fuels that extend to the forest floor due to the lack of fire.  Trees larger than 20" tend to not have branches that extend to the forest floor, because most of those trees established prior to fire suppression and have experienced fire that would prune the branches." Doc. No. 38-1 at 20-21.  Thus, removing trees with diameters smaller than 20 inches removes the fuel that can transmit a fire into the crowns of trees.

Regarding the possibility of leaving cut trees in place:

> If the felled hazard trees are not removed, it defeats the purpose of the Project.  The FMP identifies a target range of tons of biomass per any give[n] acre of 5-60 tons.  Portions of Wawona Road were treated in 2020 using the same methods and prescriptions described in the Wawona Road CE Package.  During that work, 60-500 tons per acre were removed with 125 tons per acre on average.  Ocular estimates suggest that most of the project area has similar levels of fuel loading.  There is no amount of personal protective equipment that allows [a] fire-fighter to safety approach the consumption of 125 tons per acre of fuel when it is fully combusting.

Doc. No. 38-1 at 13.  In practical terms, "Leaving the downed trees also makes it difficult for firefighters to work in the area due to increased fire intensity and difficulty maneuvering around the heavy accumulations of fuels. Additionally, the probability of stopping a wildfire along the roadway or using these areas as an anchor point is greatly reduced." Doc. No. 38-2 at 22.

In response, Plaintiff makes two arguments.  First, Plaintiff objects to "the post hoc and unvetted analysis in its litigation declaration" on the "scientific support and efficacy of its methods for managing wildfires." Doc. No. 57 at 62.  In considering the balancing of equities and the public interest, there is no reason to limit the analysis to documents produced prior to the internal approval of the Projects.

Second, Plaintiff objects that the specific actions to be enjoined are not urgent and that a

short delay due to a preliminary injunction would not be an undue harm.  As evidence, Plaintiff points to Defendants' actions, arguing "NPS simply asserts, without any evidence, that it must implement those aspects of the Project 'immediately.' But it never defines what 'immediate' implementation of these aspects of the Projects actually means in light of the limited duration of EII's requested injunction." Doc. No. 57 at 60.  Specifically, Plaintiff objects that "both Project's CE Packages claim that 'immediate action' is necessary, they both also claim they are responding to a drought that ended 5 years ago, in 2016." Doc. No. 57 at 60.  Both CE Forms note that the "project reduces post-drought and post-fire fuels" and specifically reference the "Ferguson Fire (2018)." Doc. No. 27-2 at 6-7; Doc. No. 27-4 at 5-6.  As stated, Defendants' plan is not dealing directly with the multi-year drought, but rather with the significant aftermath of that drought on the forests and subsequent fire.  Plaintiff also objects that Defendants have "not fully implemented these aspects of the Projects so far, and it has been implementing the Wawona Road Project for almost a year." Doc. No. 57 at 61.  The Yosemite Valley Project was just signed in April 2022 and was almost immediately pulled into this present case.  The record shows that the Wawona Road Project was started in October 2021 and is scheduled to be completed in 2025. Doc. No. 54-1 at 2.

Defendants respond that due to the scale of the Projects, they "will necessarily take multiple years to complete." Doc. No. 65 at 7.

> The work is inherently dangerous. Tree felling is consistently one of the top five most dangerous jobs in America (Bureau of Labor Statistics), as is firefighting (top 25 most dangerous jobs). In addition to the need to be careful with their own safety, workers most also be careful to protect archeological and natural resources. Currently the project timelines are set to complete 5 acres a workday before the funding needs to be spent. Funding for the Wawona Road Project ends on March 31st, 2024 and funding for the Yosemite Valley Project on March 31st, 2026. Those dates cannot be extended without approval of the California legislature….

> The schedules contemplated by the grants are aggressive. At five acres a day the projects will require approximately 600 workdays to complete. Finding 600 workdays during the grant period is a challenge because of the many factors that can prevent or slow work. Those include winter weather, the fisher LOP in the spring and early summer, loss of workers to firefighting, the need for on-site monitoring and the millions of visitors who crowd the primary roads and the facilities of the Yosemite Valley from Labor Day to Memorial Day. Fall is the most productive season because the weather is generally good, visitation is lower, and the fisher LOP is not in effect. I will not ask workers to accelerate pace in the event of further delays because of the increased likelihood of an accident conducting dangerous work, or potential negative impact to cultural or natural resources. Further delays mean the Projects will go unfinished, prescribed fires will go

1   unimplemented, and resources will be put increasingly at risk.

2   Doc. No. 65-1 at 4.[4]  Defendants argue that "Simply put, NPS is working as quickly as it can to

3   mitigate the risk of high severity fire and to be able to protect the Park's iconic natural resources

4   and the people who live in, visit or work in the Park (including the firefighters who risk their lives

5   trying to stop fire)." Doc. No. 65 at 8.  "The sooner the NPS is able to move forward with the

6   Projects, the sooner it will be able to use the Project roads to establish fire holding lines." Doc.

7   No. 65 at 12.  Defendants have supported their assertion that they are implementing the Projects

8   with due haste.  Granting the requested injunction would necessarily delay the completion of the

9   necessary fire mitigation.

10       "In exercising their sound discretion, courts of equity should pay particular regard for the

11   public consequences in employing the extraordinary remedy of injunction. Thus, the Court has

12   noted that '[the] award of an interlocutory injunction by courts of equity has never been regarded

13   as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff,'

14   and that 'where an injunction is asked which will adversely affect a public interest for whose

15   impairment, even temporarily, an injunction bond cannot compensate, the court may in the public

16   interest withhold relief until a final determination of the rights of the parties, though the

17   postponement may be burdensome to the plaintiff.'" Weinberger v. Romero-Barcelo, 456 U.S.

18   305, 312-13 (1982), citations omitted.  When balancing injuries of an environmental nature

19   against legitimate safety concerns, safety is the predominant consideration. See, e.g. Conservation

20   Cong. v. United States Forest Serv., 2016 U.S. Dist. LEXIS 152865, at *18-19 (E.D. Cal. Nov. 2,

21   2016); Earth Island Inst. v. Carlton, 626 F.3d 462, 476 (9th Cir. 2010).  While the ability of

22   visitors to enjoy the wilderness would likely be irreparably interfered with if the injunction is

23   denied, the weight of that concern, its substance, cannot compare to that of a legitimate plan to

24   safeguard human lives during a wildfire.  Mitigation of the threat requires implementing the

25   Projects as designed.

26       The balance of equities/public interests tip firmly in favor of denying the injunction.

27

28   [4] The Wawona Road Project has specific limitations on logging activity between March 1 and June 30 to mitigate
potential impact on the fisher. Doc. No. 27-4 at 3.

1   Consequently, Plaintiff has not established that the appropriate preliminary injunction standard for

2   examining the merits is raising serious questions as opposed to likelihood of success.

3

4   **C. Likelihood of Success on the Merits**

5          Plaintiff claims it is likely to succeed on the merits because Defendants' approval of the

6   Projects using a CE, tiering to the FMP was arbitrary and capricious, and Defendants did not take

7   a "hard look" at the environmental impact of the Projects.  Specifically, Plaintiff contends the use

8   of CE 3.3.B.1 was improper because the Projects do not involve "changes or amendments to an

9   approved plan" and because Defendants provided no analysis or documentation to show that the

10  Projects will not have more than "minimal environmental impact."  Plaintiff also argues that the

11  existence of "extraordinary circumstances" preclude Defendants from using a CE for the projects.

12  Furthermore, Plaintiff asserts that the tiering of the Projects to the FMP was improper because

13  tiering is not permitted for CEs, the FMP was not properly incorporated by reference, the Projects

14  include actions not covered by the FMP, and the analyses in the FMPs are outdated.

15         The Court will address each of Plaintiff's claims below in turn.

16

17  **1. Legal Standard**

18         A federal agency's compliance with NEPA is reviewed under the Administrative

19  Procedure Act ("APA").  See 5 U.S.C. § 706(2)(A); Karuk Tribe of Cal. v. U.S. Forest Serv., 681

20  F.3d 1006, 1017 (9th Cir. 2012) (en banc).  Under the APA, a court may set aside an agency

21  action if the court determines that the action was "arbitrary, capricious, an abuse of discretion, or

22  otherwise not in accordance with law."  Id.  "A decision is arbitrary and capricious only if the

23  agency relied on factors Congress did not intend it to consider, entirely failed to consider an

24  important aspect of the problem, or offered an explanation that runs counter to the evidence before

25  the agency or is so implausible that it could not be ascribed to a difference in view or the product

26  of agency expertise."  Conservation Cong. v. United States Forest Serv., 720 F.3d 1048, 1054 (9th

27  Cir. 2013) (citing Lands Council v. McNair, 629 F.3d 1070, 1074 (9th Cir. 2010)).  "Agency

28  action is valid if the agency considered the relevant factors and articulated a rational connection

between the facts found and the choices made." Id.  The court must be at its "most deferential"

when reviewing scientific judgments and technical analyses within the agency's expertise.  Id.

(citing Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 103 (1983)).

Accordingly, the court "must defer to a reasonable agency action 'even if the administrative record

contains evidence for and against its decision.'"  Modesto Irrigation Dist. v. Gutierrez, 619 F.3d

1024, 1036 (9th Cir. 2010) (citing Trout Unlimited v. Lohn, 559 F.3d 946, 958 (9th Cir. 2009)).

**2. Whether the Projects Qualify for a Categorical Exclusion**

NEPA requires federal agencies to perform environmental analysis before taking any

"major Federal actions significantly affecting the quality of the human environment."  Envtl. Prot.

Info. Ctr. v. Carlson, 968 F.3d 985, 987 (9th Cir. 2020) (citing 42 U.S.C. § 4332(2)(C)).  NEPA

"does not mandate particular results," but "imposes only procedural requirements to ensure that

the agency, in reaching its decision, will have available, and will carefully consider, detailed

information concerning significant environmental impacts."  Id. at 988 (citing Winter v. Nat. Res.

Def. Council, 555 U.S. 7, 23 (2008)).  An agency can comply with NEPA in three ways: (1) it can

prepare an Environmental Impact Statement ("EIS"); (2) it can prepare an Environmental

Assessment ("EA"); or (3) it can invoke a Categorical Exclusion ("CE").  Id.  An EIS is the most

searching review and is required for any action "significantly affecting the quality of the human

environment." 42 U.S.C. § 4332(2)(C).  An EA is less searching and is used to determine whether

an EIS is required. 40 C.F.R. § 1508.9.  A CE allows an agency to avoid preparing an EIS or EA.

Id.  The rationale for a CE is that a project that will have only a minimal impact on the

environment should be allowed to proceed without an EIS or EA. Id. at 990.

An agency's activity qualifies for a CE only if the activity falls within a listed category and

there are no "extraordinary circumstances" related to the proposed action.  See 36 C.F.R. §

220.6(a); see also 43 C.F.R. § 46.210 (listing departmental categorical exclusions); Los Padres

ForestWatch v. United States Forest Serv., 25 F.4th 649, 661-62 (9th Cir. 2022); Earth Island Inst.

v. Elliott, 318 F. Supp. 3d 1155, 1172 (E.D. Cal. 2018).  An "extraordinary circumstance" is a

circumstance "in which a normally excluded action may have a significant environmental effect."

1  Mt. Cmtys. for Fire Safety v. Elliott, 25 F.4th 667, 680 (9th Cir. 2022) (citing 40 C.F.R. § 1508.4).

2  "If an extraordinary circumstance is present, the agency nevertheless may categorically exclude

3  the proposed action if the agency determines that there are circumstances that lessen the impacts

4  or other conditions sufficient to avoid significant effects." 40 C.F.R. § 1501.4(b)(1).

5

6  **a. Listed Category**

7      The parties agree that the only listed category of interest is § 3.3(B)(1) of NPS's NEPA

8  Handbook, which states "Changes or amendments to an approved plan, when such changes would

9  cause no or only minimal environmental impact." The record also shows that the "approved plan"

10  of interest is the FMP. Therefore, the issue before the Court is whether the Projects' activities

11  constitute "changes or amendments" to the FMP, and whether those activities "would cause no or

12  only minimal environmental impact."

13

14  **i. Changes or Amendments to the FMP**

15      With respect to the first issue, Plaintiff argues that the following Project activities are "site-

16  specific activities" and not "changes or amendments" to the FMP: cutting live mature trees and

17  "hazard" trees, grinding and applying anti-fungal compounds to stumps, off-road log hauling,

18  chipping and/or burning of biomass material, and well and stream gage installation. See Doc. No.

19  23 at 27-28. According to Plaintiff, these activities go beyond the actions contemplated by the

20  FMP and, therefore, require their own EIS. In response, Defendants argue that they have a long

21  history of using CE 3.3.B.1 to approve projects that involve "minor deviations" to prior NEPA-

22  approved actions, and that the FMP contemplated that the NPS would take "future actions . . .

23  guided by this plan." Doc. No. 38 at 33-35.

24      The Court notes that neither party provided, and the Court's own research did not find, a

25  definition of the phrase "changes or amendments" as applied in § 3.3(B)(1).[5] However, both

26  parties reference *Sauk Prairie Conservation All. v. United States DOI* in which the Seventh Circuit

27

28  [5] Plaintiff appears to argue that the scope of the phrase "changes or amendments" encompasses only "purely
administrate undertakings." Doc. No. 23 at 27. However, Plaintiff does not cite any support for this assertion, and the
Court is unaware of any case that limited the meaning of the phrase to only "purely administrate undertakings."

reviewed whether two proposed activities—dog training and off-road motorcycle riding—constituted "changes or amendments" to an approved plan which had authorized certain activities "for recreational purposes … includ[ing] facilities for hiking, picnicking, primitive camping, Lake Wisconsin access and viewing, savanna and grassland restoration, environmental education, and cultural/historical interpretation." Sauk Prairie Conservation All. v. United States DOI, 944 F.3d 664, 667-68 (7th Cir. 2019). Although the approved plan did not explicitly mention the two challenged activities, the Seventh Circuit found that they were "recreational uses and therefore consistent with the original purposes" of Sauk Prairie Park and the approved plan. Id. at 666. The Seventh Circuit thereafter treated the two activities as proposed "changes or amendments" under § 3.3(B)(1) and analyzed whether they fell within the scope of the listed category. Id. at 679.

Here, although *Sauk Prairie* does not expressly define or discuss the meaning of the phrase "changes or amendments," it is nevertheless instructive. Like the approved plan in *Sauk Prairie*, the FMP does not explicitly mention all of the Projects' activities. However, the activities are a form of fire management and their stated purposes are "consistent with the original purposes" of the FMP, which include to (1) "[r]educe the risk of fire to cultural resources . . . through fuels reduction, prescribed burning, or fire suppression," (2) [r]educe the risk of catastrophic fire, including near the wildland/urban interface," and (3) "[e]xecute a fire management program that provides a safe environment for firefighters and the public, including safe operations and fire management related facilities." Doc. No. 29 at 34-35; Doc. No. 31-1 at 3. Therefore, as in *Sauk Prairie*, the Court will regard the Projects' challenged activities as proposed "changes or amendments" to an approved plan, that is, the FMP.

### ii. No or Only Minimal Environmental Impact

With respect to whether the Projects' activities would cause "no or only minimal environmental impact," Plaintiff argues that Defendants failed to actually conduct the necessary analysis to make this determination. According to Plaintiff, the Projects' CE Packages contain only a series of conclusions and assertions regarding no or minimal impacts—the equivalent of "checked boxes"—that fail to sufficiently analyze the impact of logging trees in the relevant

Project areas.[6]  Doc. No. 23 at 29.  Plaintiff further argues that Defendants cannot rely on *post hoc* explanations to support their approval of the Projects, but instead must rely on documentation prepared contemporaneously with those decisions.  Doc. No. 57 at 31.

In response, Defendants argue that they sufficiently analyzed the impact of the Projects' activities based on a consideration of the following factors: (1) a completion of Environmental Screening Forms ("ESF") on August 4, 2021 and April 25, 2022 which documented the agency's experts' evaluation of twenty-nine resource areas potentially affected by a project, Doc. No. 38-5 at 9-12, Doc. No. 38-6 at 10-13, Doc. No. 38-1 at 25-26; (2) the FMP's consideration of the impact of fuel reduction projects on the relevant endangered species, Doc. No 41-1 at 245-53; (3) consultations with the Fish and Wildlife Service ("FWS") on and around April 1, 2022 and December 12, 2018 regarding the fisher and the Frog, Doc. No. 39-1 at 2-6, Doc. No. 41-3 at 18, Doc. No. 38-5 at 3-4, Doc. No. 38-6 at 2-5; and (4) a convention with subject matter experts who concluded that if the resource protections included in the Projects are followed, the impact on species of special concern "are expected to be minor," Doc. No. 38-1 at 25-26, Doc. No. 38-5 at 8, Doc. No. 38-6 at 9.[7]  See Doc. No. 38 at 36-38.

As an initial matter, the Court expresses the same concern that the Seventh Circuit expressed in *Sauk Prairie*. Specifically, the inquiry into whether an action's impact will be minimal under § 3.3(B)(1) appears to be "completely circular": "Why doesn't the agency have to assess whether the action will have a significant effect [and thus require an EIS]? Because it falls within the [§ 3.3(B)(1)] minor-amendment category. Why does it fall within that category? Because it won't have a significant effect." *Sauk Prairie*, 944 F.3d at 675.  Given this circularity, it is unclear what kind of impact analysis Defendants must do for the Projects to qualify for the § 3.3(B)(1) categorial exclusion.  Id. at 675-76.  Nevertheless, the Court initially agrees with Plaintiff that an agency "cannot avoid its statutory responsibilities under NEPA merely by

---

[6] Plaintiff specifically focuses on the Projects' logging of trees up to 20 inches in diameter in sequoia groves and logging of trees in endangered species' habitats. Doc. No. 23 at 29.

[7] Plaintiff takes issue with some of these documents on the ground that they are "post hoc rationalizations." However, the record indicates that the ESF forms, FMP, FWS letters, and subject matter expert convention all predated the approval of the Wawona Road Project and Yosemite Valley Project in August 2021 and April 2022, respectively.

asserting that an activity it wishes to pursue will have an insignificant effect on the environment." Alaska Ctr. for the Env't v. United States Forest Serv., 189 F.3d 851, 859 (9th Cir. 1999); see also Cal. Wilderness Coal. v. United States DOE, 631 F.3d 1072, 1097 (9th Cir. 2011) ("[A]n agency cannot merely assert that its decision will have an insignificant effect on the environment[.]"). The agency "must adequately explain its decision" by supplying "a convincing statement of reasons why potential effects are insignificant." Cal. Wilderness Coal., 631 F.3d at 1097; Alaska Ctr. for the Env't., 189 F.3d at 859.  To determine whether an agency supplied sufficient reasons for such a decision, the Court must consider "whether the decision was based on a consideration of the relevant factors and whether there has been clear error of judgment." Alaska Ctr. for the Env't., 189 F.3d at 859 (citing Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1989)).  "Once the agency considers the proper factors and makes a factual determination on whether the impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference." Id. (citing Greenpeace Action v. Franklin, 14 F.3d 1324 (9th Cir. 1992)).

Here, based on the limited record before the Court at the preliminary injunction stage, it appears Defendants have supplied sufficient reasons for their approval of the Projects and, therefore, are likely to be entitled to deference and succeed on the merits.  The Projects' ESF forms indicate that the Projects' impact on air quality, recreational resources, and the fisher and the Frog is expected to be "minor."  See Doc. No. 38-5 at 9-12, Doc. No. 38-6 at 10-13.  The forms also indicate that the impact to vegetation, wildlife, and human health and safety is expected to be "beneficial."[8]  See Doc. No. 38-5 at 10-11, Doc. No. 38-6 at 11-12.  Although the ESF forms consist of only a few pages in which Defendants "checked a few boxes," "included a few lines of

---

[8] As noted by Plaintiff, "[a] significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial." Anderson v. Evans, 371 F.3d 475, 487 (9th Cir. 2002); see also California v. Bernhardt, 472 F. Supp. 3d 573, 627 (N.D. Cal. 2020) ("Under NEPA, 'both beneficial and adverse' effects on the quality of the human environment determine whether a proposed federal action is 'significant' and thus requires an EIS. 40 C.F.R. § 1508.27(b)(1) ('A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.')"). Here, Defendants repeatedly argue that the Projects' activities will be "beneficial" to some factors but state nothing about the degree of the "benefit."  In other words, the Project CE Packages do not expressly state whether these "benefits" are minor, moderate, or significant.  Nevertheless, the Packages state that if the Projects are implemented, they would not have "significant impacts" on public health or safety, natural resources, wilderness areas, or critical habitats for engaged species.  Doc. No. 38-5 at 8; Doc. No. 38-6 at 9.

1  brisk explanation," and reference the FMP, this was found acceptable in *Sauk Prairie*, *see* Sauk

2  Prairie, 944 F.3d at 676, and Defendants further testified in a signed declaration that the ESF

3  forms reflect their experts' evaluation of twenty-nine resource areas potentially affected by the

4  Projects.  Doc. No. 38 at 36 (citing Doc. No. 38-1 at 25-26).  The FMP's EIS further indicates that

5  the impact of conventional and mechanical tree removal and skidding on fishers and the Frog is

6  "minor" and "negligible."  Doc. No 41-1 at 245-53.  Similarly, the FWS letters upon which

7  Defendants relied state that the Projects are "not likely to adversely affect the fisher,"[9] *see* Doc.

8  No. 39-1 at 2-6, and that the impact of the FMP and MRP's thinning and meadow restoration

9  projects on the Frog "will be minimal" if the conservation measures proposed by the FWS are

10  implemented.  Doc. No. 41-3 at 18.  According to Defendants, the Projects incorporated these

11  conservation measures.  Doc. No. 38 at 37 (citing Doc. Nos. 38-5 at 3-4 and 38-6 at 2-5

12  (describing Projects' mitigation measures for the fisher and the Frog)).

13      Moreover, Defendants' Declaration of Garret Dickman states that the NPS convened with

14  a panel of subject matter experts who concluded that if the resource protections included in the

15  Projects are followed, the impact on species of special concern "are expected to be minor."  Doc.

16  No. 38-1 at 25-26.  Feedback from these forums shaped project design, implementation, and

17  mitigations, and were used to complete each of the questions in the Projects' ESF forms.  Id. at 25.

18  The subject matter experts also surveyed the Project areas beginning in 2019 using pedestrian

19  surveys, remote sensing data, and radio telemetry data to create site-specific considerations.  Id.

20  While Plaintiff takes issue with the fact that Defendants provided no documentation other than a

21  declaration regarding these forums, Plaintiff neither alleges nor presents any evidence that the

22  signed declaration is fraudulent or false.[10]  Therefore, the Court will take the signed declaration at

23

---

24  [9] The FWS reached this conclusion on the following grounds: (1) the Project area is "predominantly along busy
highways and developed areas, where ambient noise levels are high and fisher use tends to be lower"; (2) the Projects

25  "will retain the most important habitat features for the fisher and will enhance corridors between core habitats"; (3)
most tree removals are not expected to "substantially reduce the number of available fisher dens trees at the landscape

26  scale"; and (4) fisher use in the affected areas is "expected to be low" because these areas are "actively disturbed due
to general use by residents and the ambient noise levels are louder than typical forested habituated."  Doc. No. 39-1 at
6.

27  [10] Plaintiff claims that certain statements of the Dickman Declaration should be stricken because they are either post-
hoc rationalizations or not supported by citations to contemporaneous documents.  Doc. No. 52 at 4.  With respect to

28  Dickman's declaration regarding the convention of subject matter experts, Dickman states that Defendants used the
experts' feedback to shape project design, implementation, and mitigations and to complete the Projects' ESF forms.

1   its word at this stage of the litigation.  Ctr. for Biological Diversity v. United States Fish &

2   Wildlife Serv., 450 F.3d 930, 943 (9th Cir. 2006) (consideration of extra-record materials is

3   appropriate "if necessary to determine whether the agency has considered all relevant factors and

4   has explained its decision."); Earth Island Inst. v. Nash, 2020 U.S. Dist. LEXIS 71185, *17-*18

5   (E.D. Cal. Apr. 21, 2020) (considering and relying upon declarations submitted by the parties in

6   reviewing a motion for preliminary injunction).  Should evidence discovered at a later stage of this

7   case reveal otherwise, then Plaintiff may take appropriate action.

8

9   **b. Extraordinary Circumstances**

10          Plaintiff argues that the Projects have "significant impacts" on the fisher and Frog and,

11   therefore, "extraordinary circumstances" exist under § 46.215(h) to preclude the use of a CE.

12   According to Plaintiff, "the only 'analyses' provided regarding this extraordinary circumstance is

13   a 'checked box' on each Project's CE Form indicating 'no' to the existence of extraordinary

14   circumstances" and a reference to a Biological Analysis and a Programmatic Biological Opinion.

15   Doc. No. 23 at 31.  Plaintiff also argues that "extraordinary circumstances" exist in that the

16   Projects have "highly controversial environmental effects or involve unresolved conflicts

17   concerning alternative uses of available resources" under § 46.215(c).  According to Plaintiff,

18   Defendants failed to include any discussion at all regarding the applicability of the "highly

19   controversial" extraordinary circumstance to either project.

20          In response, Defendants first assert that the phrase "significant impacts" in the NEPA

21   Handbook's "extraordinary circumstances" list is to "be interpreted to mean significant *adverse*

22   _____

23   Doc. No. 38-1 at 25.  This implies that the convention took place before the Projects were approved and, therefore, is
     not a post-hoc rationalization.  Furthermore, although Dickman's declaration regarding the convention does not cite
24   any documents, the Court may nevertheless "consider and rely upon declarations" in considering a motion for
     preliminary injunction.  Earth Island Inst. v. Nash, 2020 U.S. Dist. LEXIS 71185, *17-18 (E.D. Cal. Apr. 21, 2020)
25   (citing Johnson v. Couturier, 572 F.3d 1067, 1083 (9th Cir.2009) ("A district court may . . . consider hearsay in
     deciding whether to issue a preliminary injunction.")); Lane v. CitiMortgage, Inc., 2014 U.S. Dist. LEXIS 164275, *8
26   (E.D. Cal. Nov. 20, 2014) (same).  "Such evidence need not conform to the standards for a summary judgment
     motion. . . . And the weight to be given such evidence is a matter for the court's discretion, upon consideration of the
27   competence, personal knowledge and credibility of the affiant."  Nash, 2020 U.S. Dist. LEXIS 71185, at *18.  Here,
     the Court will exercise its discretion by considering the Dickman Declaration to aid in its determination of whether
28   Defendants considered all relevant factors and has explained their decision.  Id.  Should evidence discovered at a later
     stage of this case contradict Dickman's Declaration regarding the convention, then Plaintiff may take appropriate
     action.

1  impacts." Doc. No. 38 at 39-40 (emphasis in original) (citing Doc. No. 44-3 at 49). Because the

2  impacts of the Projects are expected to be "beneficial" to the fisher and Frog, Defendants argue the

3  Projects have no "significant impacts" that create an extraordinary circumstance. Furthermore,

4  Defendants contend that even if "extraordinary circumstances" exist, the NEPA Handbook allows

5  agencies to "apply mitigation so that extraordinary circumstances would no longer apply." Id.

6  (citing Doc. No. 44-3 at 49). Given that the Projects included mitigation measures and that the

7  FWS confirmed that the impacts to the fisher and Frog are likely to be minimal or nonexistent,

8  Defendants argue that "extraordinary circumstances" do not preclude their use of a CE.

9       The "[a]pplicability of extraordinary circumstances to categorical exclusions is determined

10  by the Responsible Official." 43 C.F.R. § 46.215. "Responsible Official" is defined as "the

11  bureau employee who is delegated the authority to make and implement a decision on a proposed

12  action and is responsible for ensuring compliance with NEPA." 43 C.F.R. § 46.30. Although the

13  NEPA Handbook does not provide specific instructions on how to determine whether

14  extraordinary circumstances exist or how to document that determination, Doc. No. 38 at 39 n.30,

15  Defendants again reference their CE forms, FMP, FWS letters, and convention with subject matter

16  experts to show that they sufficiently examined whether "extraordinary circumstances" exist in

17  this case. Upon review of these documents, the Court finds that they reasonably indicate that the

18  Projects will either not present "significant adverse impacts" to the fisher or Frog, or that their

19  mitigation measures will "lessen the impacts . . . to avoid significant effects." See Doc. Nos. 38-5

20  at 9 and 38-6 at 10 (ESF forms stating that the Projects' impact on the fisher and the Frog are

21  "expected to be minor"); Doc. No 41-1 at 246-53 (FMP EIS indicating that the impact of

22  conventional and mechanical tree removal and skidding on the fisher and Frog is "beneficial,"

23  "minor," and "negligible"); Doc. No. 39-1 at 2-6 (April 1, 2022 FWS letter concurring with NPS

24  that the Projects are "not likely to adversely affect the fisher"); Doc. Nos. 38-5 at 3-4 and 38-6 at

25  2-5 (CE forms describing Projects' mitigation measures for the fisher and Frog); Doc. No. 41-3 at

26  18 (December 12, 2018 FWS biological opinion stating that the impact of the FMP and MRP's

27  thinning and meadow restoration projects on the Frog "will be minimal" if the conservation

28  measures proposed by the FWS are implemented); Doc. No. 38-1 at 25-26 (Dickman Declaration

stating that the NPS convened with a panel of subject matter experts who concluded that if the resource protections included in the Projects are followed, the impact on species of special concern "are expected to be minor").  Therefore, based on the limited record before the Court at this stage of the litigation, Defendants' claim that the Projects present no "significant impacts" on the fisher and Frog under § 46.215(h) will likely succeed on the merits and be entitled to deference.

Plaintiff does not deny that the NEPA Handbook interprets "significant impacts" to mean "significant adverse impacts."  Rather, Plaintiff contends that significant adverse impacts are present in the Projects' "potential to generate indirect harm to resident fisher" arising from the "potential loss of 2000-3000 acres of habitat" and that four fisher trees are located "within 650 feet of a paved road."  Doc. No. 57 at 34 (citing Doc. Nos. 38 at 55 and 42 at 7, ¶ 19).  However, the sources upon which Plaintiff relies for these assertions also state that the Projects' thinning and biomass removal efforts "focus on areas rarely used by fishers" and "are unlikely to negatively impact fishers nor are they likely to reduce usable fisher habitat quality."  Doc. No. 42 at 7-8, ¶¶ 19-20.  Defendants' FWS consultation letter also addresses the above concerns raised by Plaintiff. Specifically, the FWS found that "[a]lthough approximately 3,000 acres of fisher habitat (foraging, potential denning habitat, and high quality habitat) occur within the proposed project area," the Projects will "retain the most important habitat features for the fisher" and occur in areas where fisher use "is expected to be low"; therefore, the Projects are not expected to "substantially reduce the number of available fisher den trees at the landscape scale" and are "not likely to adversely affect the fisher." See Doc. No. 39-1 at 5-6.

Furthermore, the limited evidence before the Court at this early stage of the case do not sufficiently indicate that "extraordinary circumstances" exist in the form of "highly controversial environmental effects."  A project is "highly controversial" if there is a "substantial dispute about the size, nature, or effect of the major Federal action rather than the existence of opposition to a use."  Safari Club Int'l v. Haaland, 31 F.4th 1157, 1179 (9th Cir. 2022).  "Mere opposition to an action [by a party] does not, by itself, create a controversy within the meaning of NEPA regulations."  Id.; see also NPS NEPA Handbook, Doc. No. 44-3 at 29-30 ("[S]ubstantial dispute

within the scientific community about the effects of a proposed action would indicate that the effects are likely to be highly controversial and therefore likely significant.").  Here, Plaintiff makes four parenthetical references to show that "such high controversy exists in this matter."  See Doc. No. 57 at 34-35 (referencing Doc. No. 38-1 at 16, ¶ 37, Doc. No. 39 at 10-11, ¶ 21, Doc. No. 42 at 10, ¶ 27, and Doc. No. 38-4 at 8, ¶ 20(a)).  However, the Court's review of these references indicate that they do not show a substantial dispute within the scientific community about the Projects' effects.  Two of the references consist of disagreements over Hanson's personal beliefs, tactics, or methodology.  See Doc. No. 38-1 at 16, ¶ 37 (describing disagreement over Hanson's use of science, tactics, and methodology); Doc. No. 42 at 10, ¶ 27 (describing disagreement over Hanson's statement that "I am concerned that the proposed logging would seriously degrade the habitat of many local species thereby decreasing, or eliminating, their presence in the project area, making it difficult, if not impossible, for me to conduct research.").  One of the references consists of disagreements between the parties themselves with a citation by Defendants that Plaintiff does not substantively address.[11]  See  Doc. No. 39 at 10-11, ¶ 21 ("Plaintiff and its declarants disagree with the Park's thinning and bio-removal strategies . . . [M]y staff could not disagree more.").  Finally, the last reference concerns Hanson's claim that high-intensity fires yield higher reproduction rates for sequoia trees than fire suppression or low-intensity fires.  See Doc. No. 38-4 at 8, ¶ 20(a).  While this reference appears to provide stronger evidence of "controversy" than the other three references, Plaintiff's single parenthetical explanation for why it is "highly controversial" is cursory and deficient in explaining how it applies to the "Projects' activities.[12]

---

[11] The Court recognizes that Plaintiff moved to strike the Letter from Professors Stephens and Collins that is cited by Defendants in Doc. No. 39 at 11, ¶ 21.  See Doc. No. 52 at 4 n.1.  However, Plaintiff's motion did not challenge the Letter on the basis that the scientific community disagrees with what Professors Stephens and Collins state in the Letter. Instead, Plaintiff's motion challenged the letter on the basis that it is a post hoc rationalization for the Projects. Therefore, Plaintiff's reference to Doc. No. 39 at 10-11, ¶ 21 does not establish that the "environmental effects" of the Projects are "highly controversial."

[12] Plaintiff also cites California v. Norton, 311 F.3d 1162 (9th Cir. 2002) in support of its claim that the Projects present "highly controversial environmental effects."  Doc. No. 57 at 35-36.  But as Plaintiff acknowledges, the Norton case involved a post hoc invocation of CEs after the defendant failed to make a CE determination at the time it approved the challenged actions. Norton, 311 F.3d at 1175.  This is not the case here.  Additionally, the "highly controversial environmental effects" in Norton were the subject of broad public controversy in which California's governor and a U.S. Senator wrote on behalf of the people of California to express strong opposition to the challenged activity.  Id. at 1176.  The "continuous and significant public controversy over the environmental effects of [the challenged activity] in California for the past thirty years" was "beyond debate" and persuaded the Norton panel to

1    Moreover, as noted above, the NPS NEPA Handbook allows agencies to "apply mitigation

2  so that extraordinary circumstances would no longer apply." Doc. No. 44-3 at 49.  Here,

3  Defendants reference numerous documents indicating the Projects' mitigation measures.  Doc.

4  Nos. 38-5 at 2-4, 19 and 38-6 at 2-5, 18-19; Doc. No. 41-3 at 8-12, 18; Doc. No. 38-1 at 25-26.

5  Although mitigation measures alone are not sufficient to meet an agency's NEPA obligations, the

6  mitigation measures in this case were not considered in isolation but were an additional factor

7  Defendants considered along with other factors as discussed above.  Plaintiff does not address this

8  point on mitigation in its briefing, and instead argues that "high controversy" exists regarding the

9  general practice of commercial thinning.  See Doc. No. 57 at 34-35; see also Doc. No. 46 at 5-6, ¶

10 6 (stating "commercial logging—in the form of commercial 'thinning' and post-fire logging—is

11 highly controversial in the scientific community").  Thus, Plaintiff does not expressly dispute that

12 the Projects apply mitigations such that "extraordinary circumstances would no longer apply."

13    Accordingly, because the limited evidence before the Court reasonably indicates that the

14 Projects neither "significantly impact" the fisher or Frog nor have "highly controversial

15 environmental effects," Plaintiff has not shown it is likely to succeed on the merits in that the

16 Projects involve "extraordinary circumstances" that preclude the use of a CE.

17

18 **3. Whether Defendants Properly Tiered the CEs**

19    "Tiering" is defined as "avoiding detailed discussion by referring to another document

20 containing the required discussion."  All. for the Wild Rockies v. U.S. Forest Serv., 907 F.3d

21 1105, 1118 (9th Cir. 2018) (citing Kern v. United States Blm, 284 F.3d 1062, 1073 (9th Cir.

22 2002)).  NEPA regulations allow agencies to "tier" later NEPA documents to earlier NEPA

23 documents so that the agency can "avoid some of the burdens of the NEPA process."  Id.  The

24 later NEPA documents "concentrate on issues specific to the current proposal" while the earlier

25 NEPA documents are broader and "cover matters more general in nature."  N. Alaska Envtl. Ctr.

26 v. United States DOI, Bureau of Land Mgmt., 983 F.3d 1077, 1090 (9th Cir. 2020).  An agency

27

28 hold that the "highly controversial environmental effects" exception applied to bar the CE.  Id. at 1177.  Here, Plaintiff
did not submit similar evidence of "continuous and significant public controversy" that was "beyond debate."

1  may tier to a NEPA document if the subsequent statement is either of "lesser scope" or a

2  "statement or analysis at a later stage." <u>Cal. ex rel. Imperial Cty. Air Pollution Control Dist. v.</u>

3  <u>United States DOI</u>, 767 F.3d 781, 792 (9th Cir. 2014).  "[T]he previous document must actually

4  discuss the impacts of the project at issue," <u>Native Vill. of Nuiqsut v. BLM</u>, 9 F.4th 1201, 1213

5  (9th Cir. 2021), and have been subject to NEPA review. <u>Kern</u>, 284 F.3d at 1073.

6

7  **a. Tiering CEs**

8          Plaintiff argues that NEPA does not contemplate CEs tiering to other NEPA documents.

9  According to Plaintiff, tiering is only appropriate in two situations, both of which involve tiering

10  to or from an EIS or EA.  In response, Defendants contend that courts including the Ninth Circuit

11  have affirmed agency actions where a CE tiered to an EA or EIS.

12          40 C.F.R. § 1501.11(a) provides that "[a]gencies should tier their environmental impact

13  statements and environmental assessments when it would eliminate repetitive discussions of the

14  same issues, focus on the actual issues ripe for decision, and exclude from consideration issues

15  already decided or not yet ripe at each level of environmental review."  The regulation further

16  states that "[t]iering is appropriate when the sequence from an environmental impact statement or

17  environmental assessment is: [f]rom an environmental impact statement or environmental

18  assessment on a specific action at an early stage (such as need and site selection) to a supplement

19  (which is preferred) or a subsequent statement or assessment at a later stage (such as

20  environmental mitigation)."  40 C.F.R. § 1501.11(c)(1).  As both parties note, the tiering

21  regulation expressly mentions "environmental impact statements" and "environmental

22  assessments" but says nothing about "categorical exclusions."  Defendants suggest this absence

23  means that the requirements for tiering do not apply to CEs while Plaintiff contends it means that

24  CEs are not allowed to take advantage of tiering in the first place.

25          Although the body of caselaw regarding this issue is sparse, the Ninth Circuit's decision in

26  *Ctr. for Biological Diversity v. Salazar* is pertinent to this case.  <u>See</u> <u>Ctr. for Biological Diversity</u>

27  <u>v. Salazar</u>, 706 F.3d 1085, 1098 (9th Cir. 2013).  In *Salazar*, the appellant presented a nearly

28  identical argument to that of Plaintiff.  <u>Id.</u>  Specifically, the appellant argued that NEPA

regulations for tiering and incorporation by reference are limited to EISs and that agencies may not tier CEs to prior EAs in their analysis. Id.  The district court rejected this argument and the Ninth Circuit affirmed on the ground that the incorporation by reference regulation expressly pertained to the preparation of an EIS and not a CE.  Id. (citing § 1502.21 ("Agencies shall incorporate material into an *environmental impact statement* by reference when the effect will be to cut down on bulk without impeding agency and public review of the action.") (emphasis added)).  Because the agency in *Salazar* prepared a CE, the panel held that the agency's use of the prior analysis in preparing the CE was appropriate.  Id.

In light of *Salazar*, the Court finds here that Defendants are likely to succeed on the merits in that their use of the FMP's analysis in preparing the Project CEs was appropriate.  At the time *Salazar* was decided in 2013, the regulations regarding tiering and incorporation by reference appeared in 40 C.F.R § 1502.20 (tiering) and 40 C.F.R. § 1502.21 (incorporation by reference).  Although these regulations were revised in 2020, the *Salazar* panel's interpretation of them is still applicable to this case.  The revised tiering regulation 40 C.F.R. § 1501.11 expanded 40 C.F.R § 1502.20 to apply when a subsequent EIS or EA tiers to an earlier EA, and not just to an earlier EIS.  The revised incorporation by reference regulation 40 C.F.R. § 1501.12 similarly expanded 40 C.F.R. § 1502.21 to apply when environmental documents other than an EIS incorporates other materials by reference.  These other "environmental documents" include an EA, a finding of no significant impact, or a notice of intent.  40 C.F.R. § 1508.1(i).  Noticeably absent in each of these regulations is an express reference to categorical exclusions.  Therefore, the *Salazar* panel's discussion on the significance of this absence in § 1502.20 and § 1502.21 should also apply to § 1501.11 and § 1501.12.  Accordingly, like § 1502.21, § 1501.12 is still expressly "applicable to environmental impact statements [and now also environmental assessments], *not categorical exclusions*."  Salazar, 706 F.3d at 1098 (emphasis added).  The same reasoning also applies to § 1502.20 and § 1501.11, given that they expressly mention EIS and EA and not CE.[13]  Although

_____

[13] The *Salazar* panel did not explicitly state, like it did for the incorporation by reference regulation, that the tiering regulation is expressly applicable to EISs and not CEs.  However, given that both regulations do not mention CEs, the *Salazar* panel's reasoning regarding the incorporation by reference regulation should also apply to the tiering regulation. Salazar, 706 F.3d at 1098. Additionally, given that the two regulations generally apply when a document tiers to another document, it would be inconsistent and nonsensical for a CE to be excused from one tiering regulation

1    Plaintiff argues that the CEQ could have easily added the term "categorical exclusion" to the

2    revised regulations if it intended that CEs could tier or incorporate other documents by reference,

3    Doc. No. 57 at 41, the opposing argument can also be made that the CEQ easily could have

4    included the language in the revised regulations if it intended for the regulations to apply to CEs.

5    Given the *Salazar* panel's apparent adoption of the latter argument, <u>Salazar</u>, 706 F.3d at 1098, the

6    Court is bound by this Ninth Circuit precedent and holds that the incorporation by reference and

7    tiering regulations do not restrict the CEs in this case.

8

9    **b. "Additional" Actions**

10       Plaintiff argues that the Projects include "additional" actions that cannot tier to the FMP or

11   MRP.[14]  According to Plaintiff, these "additional" actions are subject to NEPA and, therefore,

12   Defendants were required to analyze them in the form of an EIS or EA or exclude them from

13   NEPA review through a CE.  In response, Defendants argue these additions were the subject of the

14   CE and that the NPS determined that they had no more than minimal impact.

15       With respect to whether the alleged "additional" actions of the Projects properly tiered to

16   the FMP and MRP, Plaintiff acknowledges in its briefing that these "additional" activities may be

17   categorically excluded from further NEPA review if Defendants satisfied the CE requirements.

18

19   but not the other.  Reason and efficiency dictate that either both regulations apply or neither apply, and the Ninth
     Circuit already held that the incorporation by reference regulation is not applicable to CEs. <u>Id.</u>

20   [14] The "additional" actions alleged by Plaintiff include the following:
         For the Wawona Road Project:

21   • "Remove biomass with rubber balloon tire, skidding, winching or with tracked equipment (*FMP does not
     specify if tracked equipment is permitted along road corridors). Equipment will go off road but will not enter

22   Wilderness."

23   • "South side drive-Wawona Road to Big Oak Flat Road: 1.86 miles, 92.72 acres (*FMP does not specify
     roadside thinning on south side drive)"

24   • "The following two road segments expand what is prescribed in the FMP [by expanding the treated area
     beyond the prescribed 200' corridor] . . ."

25   • "Merced Grove of sequoias (~60 acres). Heavy equipment may not operate off-road to avoid damaging
     sequoia seedlings or sequoia roots. (*FMP calls for removal of conifers <12" diameter in sequoia groves. It

26   has been 17 years since the FMP was written. Tree density far surpasses the on the ground conditions and
     removal of 12" diameter trees is insufficient to protect the sequoias.)."

27       For the Yosemite Valley Project:
     • Logging activities including in "several areas in the West Valley not currently covered by either EIS."

28   <u>See</u> Doc. No. 23 at 33.

1   See Doc. No. 23 at 32.  Because the Court found above that the activities are likely to succeed on

2   the merits in qualifying for a CE, the Court further finds that Defendants are likely to succeed on

3   the merits regarding their tiering of these "additional" activities to the FMP or MRP.

4

5   **c. Validity of FMP**

6           Plaintiff argues that the Projects cannot tier to the 2004 FMP because it is stale and was

7   otherwise superseded by the 2017 amendments. According to Plaintiff, the Projects were required

8   to address and discuss the consistencies and inconsistencies between the 2004 and 2017 versions,

9   and to explain in light of the inconsistencies why the 2004 version is still valid or invalid.  For

10  example, Plaintiff highlights an inconsistency involving the logging of trees less than 20 inches in

11  diameter within 200 feet of multiple roads.  Although most of these areas were within the 2004

12  FMP's Suppression Units (17% of the Park), the 2017 amendments replaced them with the much

13  smaller CIPS Units (1% of the Park), and now a majority of logging along roads for the Wawona

14  Road Project and a significant portion of the logging along roads for the Yosemite Valley Project

15  take place outside the CIPS units.  According to Plaintiff, this means that the 2004 FMP provides

16  no basis for the Projects to thin NWUI trees between 6 and 20 inches in diameter and, therefore, is

17  outdated.  Plaintiff further argues that the FMPs do not reflect the current conditions in Merced

18  Grove and, therefore, are out of date in this regard.

19          In response, Defendants contend that the 2004 FMP continues to govern and that the 2017

20  FMP merely amended the 2004 version without outright superseding it.  Defendants also argue

21  that the amendments modified the FMP's treatment prescriptions by rezoning the Park to be

22  "managed as one unit," giving fire managers the flexibility to employ "the full range of fire

23  management options," and "allow[ing] the park to make decisions based on science, weather and

24  local concerns rather than geographic zones."  Doc. No. 38 at 18-19.  Furthermore, Defendants

25  assert that the 2017 FMP retained the 2004 FMP's road corridor direction applying in NWUI

26  areas.  According to Defendants, this means that the 2004 FMP still authorizes the Projects to thin

27  trees less than 20 inches in diameter within 200 feet of the centerline of roads in the affected areas.

28  Defendants further argue that tree density has substantially increased in two areas within the

Merced Grove and, therefore, the Projects aim to remove some trees up to 20 inches in diameter from those areas to reduce that density and protect sequoias in accordance with the original intent of the FMP.

As an initial matter, the Court notes that the Projects did not tier solely to the 2004 FMP. The Project CE forms state that their "[a]ctions are generally covered by" the 2017 FMP and 2004 FMP. Doc. No. 38-5 at 7; Doc. No. 38-6 at 8. Additionally, the forms state that the Projects "follow[] the 2004 Fire Management Plan EIS . . . with several additions," and that "[a]ctions are described for those that adhere directly to the FMP . . . and then those actions that tier off the FMP." Doc. No. 38-5 at 5; Doc. No. 38-6 at 6. The forms further state that "[t]iered actions are specifically called out with an explanation how it differs from [the FMP]," Doc. No. 38-5 at 5; Doc. No. 38-6 at 6, and that the "Mitigations and Other Compliance/Consultations" sections address the "new impacts" of those actions not directly covered by the FMPs. Doc. No. 38-5 at 7; Doc. No. 38-6 at 8. Therefore, in light of the manner by which the Projects tiered to the FMP while accounting for differences, the issue before the Court is whether the Project activities that tiered to the FMP tiered to sections that are valid and applicable to those activities.

Upon review, the Court finds that the tiered-to sections of the 2004 FMP are likely to be valid and still appliable to the Projects. Defendants could reasonably interpret these sections as still governing and not superseded in their entirety by the 2017 amendments. With respect to the Wawona Road Project's activities in Merced Grove, the Project's CE form states that these activities will "expand" the FMP's "calls for removal of conifers <12" diameter in sequoia groves" by allowing for the thinning of conifers less than 20 inches in diameter. Doc. No. 38-5 at 5-6. In other words, the Project's thinning of Merced Grove conifers less than 12 inches in diameter directly tiered to the FMP while the thinning of conifers between 12 and 20 inches in diameter "expanded" the FMP. Plaintiff does not question the validity of the activities directly covered by the FMP, and as discussed above, Defendants reasonably concluded that the "new impacts" of thinning of Merced Grove trees between 12 and 20 inches in diameter were minimal and thus categorically excluded from NEPA review based on their consideration of the Project CE forms, FMP, FWS letters, and convention with subject matter experts. Therefore, the manner by

which the Wawona Road Project tiered its Merced Grove activities to the FMP was not improper

because the tiered-to FMP sections are still valid and the uncovered activities were likely

categorically excluded from NEPA review.

With respect to the Park's rezoned fire management prescriptions, the decrease of

Suppression/CIPS Units from 17% to 1% and the increase of Fire Use/Wildland Fire Management

Units from 83% to 99% did not substantively change the 2004 FMP's road corridor direction

applying in NWUI areas.  Namely, the 2004 FMP permits in Suppression Unit NWUI areas

"[p]assive thinning of small trees less than 20" dbh [] within 200' of the centerline of roads and

under utility lines where canopies are closely packed." Doc. No. 44-1 at 10.  The 2017

Amendment retained this exact language in its section covering the logging of NWUI trees in

CIPS Units. Id. at 11.  Meanwhile, the 2004 FMP indicates that in Fire Use Unit NWUI areas

"[p]rescribed fire and thinning of small trees generally less than 6" dbh would be done to protect

these areas as a wildland fire approaches." Doc. No. 44-1 at 11.  The 2017 FMP amended this

language only by replacing the word "wildland" with "wildfire." Doc. No. 44-1 at 12.  Therefore,

Defendants are correct in stating that the 2017 amendments effectively retained the 2004 FMP's

road corridor direction applying in NWUI areas.

Furthermore, the record does not indicate that the 2017 FMP amended the 2004 FMP's

section on "Roads and Trails Used for Fire Protection," which provides that roads are "used as

boundaries for prescribed burns, anchor points for constructing fire line, and as fire line." Doc.

No. 39-4 at 47.  This section further states that "maintenance" along the roads is required "as

needed, annually on some fire roads and every five to eight years on other roads" to keep road

corridors "free from fuel accumulation" and "open and in a condition that provides for firefighter

safety as a defensible fire line." Id. at 47-48.  The "maintenance" work specifically includes

"thin[ning] trees and shrubs less than 20" dbh up to 200' from the centerline of roads in the

Suppression Unit." Id.

Although the 2004 FMP expressly states that this "tree thinning maintenance" is to be

performed "in the Suppression Unit," Defendants argue that the maintenance work now applies to

road corridors located outside CIPS and Wilderness areas because the 2017 amendments abolished

the Suppression Unit, substituted the CIPS for the former WUI areas, and increased the Park's flexibility to manage fires outside CIPS areas.  Based on the record at this stage in the case, the Court agrees that this is a reasonable interpretation of the FMPs, even if the record "contains evidence for and against" this interpretation.  Modesto Irrigation Dist., 619 F.3d at 1036.

The record indicates that many of the roads covered by the Projects, such Wawona Road, Henness Ridge Road, Big Oak Flat Road, El Portal Road, Tioga Corridor, Merced Grove Road, and Eleven Mile Road, are roads that the 2004 FMP explicitly identifies as "commonly used as fire access for summer wildland fires and as control lines for prescribed fires."  See Doc. No. 39-4 at 48 (Table II-11); Doc. No. 38-5 at 5-6; Doc. No. 39-1 at 3-4.  The record also indicates that the 2017 FMP amended the 2004 FMP's two-part division of the Park by abolishing the Suppression Unit and replacing it with a "Community Protection Strategy" that called for fire suppression only in areas immediately surrounding WUI areas and other important infrastructure developments.  Doc. No. 39-3 at 16-18; Doc. No. 39-5 at 3-4.  The updated plan purportedly allows Defendants to manage the Park as "one unit" and to "make decisions based on science, weather and local concerns rather than geographic zones."  Doc. No. 39-5 at 3 ("Under the Community Protection Strategy the park would be managed as one unit."); Doc. No. 39-3 at 16-18.  Within this "one unit," "[t]he use of wildland fire will be based on the need for both ecosystem and restoration and protection of homes, businesses, historic buildings, and other developments."  Doc. No. 39-5 at 3-4.  In light of these facts and the increased fire management flexibility that the 2017 amendments afforded to Defendants, it was reasonable for Defendants to conclude that they could tier the Projects' tree thinning activities to the 2004 FMP while noting and accounting for any differences.  As discussed above, Defendants reviewed the potential impact of the Projects' "additional" act of thinning trees less than 20 inches in diameter generally within 200 feet of the centerline of roads and reasonably concluded that the "new impacts" were minimal and thus categorically excluded from NEPA review.  Again, should evidence discovered at a later stage of this case reveal otherwise, then Plaintiff may take appropriate action.

Plaintiff argues that significant portions of the Projects occur in the Park's Fire Use/Wildland Fire Management Unit, which does not expressly approve the thinning of NWUI

35

trees between 6 and 20 inches in diameter within 200 feet of the centerline of roads.  While this is

technically correct, it is also correct that this Unit does not expressly mandate that *only* trees less

than 6 inches in diameter may be thinned within its area.  Doc. No. 44-1 at 12.  The FMPs indicate

that thinning "would be done" on trees "generally less than" 6 inches in diameter "as a wildfire

approaches."  Id.  The FMPs do not state that prescribed fire and thinning can only be done when

these conditions are present, nor do they expressly prohibit thinning of trees greater than 6 inches

in diameter.  Additionally, the FMPs expressly state that "[t]rees, including dead trees, would be

cut as needed to provide safe and secure fire lines" in tracts "located mostly along road corridors."

Id.  Although it is not entirely clear how the Park can be "managed as one unit" while having

separate CIPS Units and Wildland Fire Management Units, the FMPs clearly state that Defendants

are allowed to keep road corridors "free from fuel accumulation" and "open and in a condition that

provides for firefighter safety as a defensible fire line" and to "make decisions based on science,

weather and local concerns rather than geographic zones."  The existence of "evidence for and

against" Defendants' interpretation of the record does not automatically make the interpretation

unreasonable.  Modesto Irrigation Dist., 619 F.3d at 1036.  As previously noted, it was reasonable

for Defendants to conclude based on the record at this stage of the case that they could tier the

Projects' tree thinning activities to the 2004 FMP with a consideration and explanation of how

those activities differ from the FMP.  Accordingly, the Court finds that Plaintiff has not shown it is

likely to succeed on the merits regarding the validity of the tiered-to sections of the FMP.

**4. Hard Look**

NEPA created "a set of 'action-forcing' procedures that require that agencies take a 'hard

look' at environmental consequences, and that provide for broad dissemination of relevant

environmental information. Although these procedures are almost certain to affect the agency's

substantive decision, it is now well settled that NEPA itself does not mandate particular results,

but simply prescribes the necessary process." Robertson v. Methow Valley Citizens Council, 490

U.S. 332, 350 (1989), citations omitted.  Plaintiff argues that "NPS's failure to take a hard look at

the Projects' site-specific impacts of logging within the Merced Sequoia Grove and logging within

1  Pacific fisher habitat was arbitrary and capricious, an abuse of discretion, and in violation of

2  NEPA." Doc. No. 23 at 41.  Defendants argue that "the NPS gave site-specific attention to both

3  the Merced sequoia grove and the fisher." Doc. No. 38 at 45.

4       "A 'hard look' includes 'considering all foreseeable direct and indirect impacts.

5  Furthermore, a "hard look" should involve a discussion of adverse impacts that does not

6  improperly minimize negative side effects.' '[G]eneral statements about possible effects and some

7  risk do not constitute a hard look absent a justification regarding why more definitive information

8  could not be provided.'" League of Wilderness Defenders-Blue Mountains Biodiversity Project v.

9  U.S. Forest Serv., 689 F.3d 1060, 1075 (9th Cir. 2012) (citing N. Alaska Envtl. Ctr. v.

10 Kempthorne, 457 F.3d 969, 975 (9th Cir. 2006) and Or. Natural Res. Council Fund v. Brong, 492

11 F.3d 1120, 1134 (9th Cir. 2007)).  In particular, "A mere listing of mitigation measures is

12 insufficient to qualify as the reasoned discussion required by NEPA." Neighbors of Cuddy Mt. v.

13 United States Forest Serv., 137 F.3d 1372, 1380 (9th Cir. 1998) (quoting Northwest Indian

14 Cemetery Protective Ass'n. v. Peterson, 795 F.2d 688, 697 (9th Cir. 1986)).

15      Plaintiff argues that with regards to the fisher, "both Forms also acknowledge the potential

16 for impacts to this species, but fail to disclose what those impacts actually are, or to actually

17 analyze them. Instead, the CE Packages merely point to ESA-compliance documents – a

18 Biological Assessment mentioned in passing in the Wawona Road Project CE Package, and a

19 Programmatic Biological Opinion for the fisher, to which the NPS purported to 'append[]' the

20 Yosemite Valley Project to – to support its position that impacts to fishers do not rise to the level

21 of significance that requires an EA or EIS." Doc. No. 23 at 39-40, citations omitted.  "Although

22 the FMP EIS generally addresses impacts to fishers, NPS failed to do site-specific analysis,

23 including analysis of the degree/intensity of tree removal up to 20 inches in diameter, for the

24 different actions that will occur under the Projects that were not included within the FMP itself."

25 Doc. No. 57 at 51.

26      Much of the documentation Defendants refer to come from the 2004 FMP and associated

27 documents which were drafted a long time ago.  Even the 2017 FMP predated the current Projects.

28 The more relevant documentation comes from more recent sources.  Defendants rely on the

records of the consultation with the FWS (discussed above) which concluded that there was unlikely to be an adverse effect on the fisher; the FWS specifically considered what kind of habitat was being affected by the Projects and the fact that trees of up to 20 inches in diameter would be cut:

> Although the proposed project area is large, it is predominantly along busy highways and developed areas, where ambient noise levels are high and fisher use tends to be lower. Disturbance will be minimized by following a limited operating period to protect denning fisher in all areas overlapping with potential fisher denning habitat. Although the limited operating period is reduced outside known den clusters, work is not expected to occur continuously for the entire two to four weeks in these areas, since work crews move around frequently. The proposed project will retain the most important habitat features for the fisher and will enhance corridors between core habitats. No large oak trees are being removed (large oak trees are the most common fisher den trees) and the majority of removals are small trees; thus, we do not expect these tree removals to substantially reduce the number of available fisher den trees at the landscape scale. Further, actual impacts are expected to occur in a much smaller area since the tree removal is selective, removing only conifers less than 20 inches in diameter and standing dead and down trees; thus, ensuring that fisher habitat will remain suitable and protected from future catastrophic wildfires that may destroy habitat. The Service originally considered the areas within the communities of Yosemite West and Wawona as being avoided in the original consultation. These areas will now be impacted in the same manner as described above. Similarly, the areas within these communities are actively disturbed due to general use by residents and the ambient noise levels are louder than typical forested habitat, so fisher use is expected to be low. Therefore, unless new information reveals effects of the proposed project that may affect listed species in a manner or to an extent not considered, or a new species or critical habitat is designated that may be affected by the proposed project, no further action pursuant to the Act is necessary.

Doc. No. 39-1 at 6.

Plaintiff argues with regards to the Merced Grove, "although the 2004 FMP EIS clearly contemplates some logging within the Park's three Sequoia groves (part of the FMP's 'Special Management Areas') the very general discussion in that programmatic EIS, contains absolutely no analysis of the site-specific impacts of conducting such logging within the Merced Grove, as the Wawona Road project authorizes." Doc. No. 23 at 39.  As discussed above, Defendants concluded that the cutting of trees in the Merced Grove between 12 and 20 inches in diameter had minimal negative impact on the sequoias. Doc. No. 38-5 at 5-6.  In particular, Defendants cite to declaration of Dickman who states: "The decision to remove 20" trees was carefully considered and comes from my extensive on-the-ground experiences protecting sequoias during fire, a workshop of sequoia managers and scientists about the Merced Grove, and through a scientific

advisory written by Dr. Stephenson, USGS emeritus, that advised removal of non-sequoia conifers up to 20 inches diameter to remove ladder fuels that could torch sequoias of any size." Doc. No. 38-1 at 24.

Based on this preliminary record, Plaintiff has not refuted Defendants' evidence that they have undertaken a hard look at the environmental consequences.  Plaintiff has not shown that it is likely to succeed on the merits on this point.

**D. Conclusion**

A plaintiff seeking a preliminary injunction must establish: (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  Plaintiff has established a likelihood of irreparable harm but has not met the other elements.  Significantly, the balance of equities/public interest tips firmly in favor of denying an injunction.  Additionally, Plaintiff has not established a likelihood of success on the merits which "'is the most important' *Winter* factor." Disney Enters. v. VidAngel, Inc., 869 F.3d 848, 856 (9th Cir. 2017).  On this basis, the request for an injunction must be denied.

### IV. ORDER

Plaintiff Earth Island Institute's amended motion for preliminary injunction is DENIED.

Plaintiff Earth Island Institute's motion to strike is DENIED.

Plaintiff Earth Island Institute's motion to file sur-sur-reply is DENIED.

IT IS SO ORDERED.

Dated:   September 21, 2022      _____

SENIOR  DISTRICT  JUDGE

39