# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **EARTH ISLAND INSTITUTE, a non-profit corporation,**<br><br>**Plaintiff,**<br><br>v.<br><br>**CICELY MULDOON, in her official capacity as Superintendent of Yosemite National Park; UNITED STATES PARK SERVICE, an agency of the United States Department of the Interior; UNITED STATES DEPARTMENT OF THE INTERIOR,**<br><br>**Defendants** | **CASE NO. 1:22-CV-00710-AWI-EPG**<br><br>**ORDER RE: PLAINTIFF'S REQUEST FOR INJUNCTION PENDING APPEAL**<br><br>(Doc. No. 74) |

## I. FACTUAL BACKGROUND

Plaintiff filed a request for preliminary injunction (Doc. No. 22) which Defendants opposed (Doc. No. 38). This Court denied the motion; the relevant facts of this case are set out in that order. Doc. No. 71. Plaintiff appealed the denial to the Ninth Circuit. Doc. No. 72. Plaintiff then filed this motion seeking an injunction pending appeal. Doc. No. 74. Of note, Plaintiff is requesting a stay based on a further narrowed request to enjoin the thinning of trees in the Merced Grove only. Doc. No. 78 at 22. Plaintiff simultaneously approached the Ninth Circuit for the same relief, injunction pending resolution of the appeal. See Doc. No. 78 at 1 fn.1. The Ninth Circuit has already summarily denied the request. Doc. No. 80. This order serves to formally resolve the remaining motion on the trial court's docket.

## II. LEGAL STANDARDS

"In deciding whether to grant an injunction pending appeal, courts apply the standard employed when considering a motion for a preliminary injunction." Protect Our Water v. Flowers, 377 F. Supp. 2d 882, 883 (E.D. Cal. 2004); see also Feldman v. Ariz. Sec'y. of State's Office, 843 F.3d 366, 367 (9th Cir. 2016) ("The standard for evaluating an injunction pending appeal is similar to that employed by district courts in deciding whether to grant a preliminary injunction."). Federal Rule of Civil Procedure 65 governs preliminary injunctions and temporary restraining orders. A plaintiff seeking a preliminary injunction must establish: (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). "We evaluate these factors via a 'sliding scale approach,' such that 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest.'" Arc of Cal. v. Douglas, 757 F.3d 975, 983 (9th Cir. 2014) (quoting Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 and 1135 (9th Cir. 2011)). "Injunctive relief...must be tailored to remedy the specific harm alleged." Park Vill. Apt. Tenants Ass'n v. Mortimer Howard Trust, 636 F.3d 1150, 1160 (9th Cir. 2011).

## III. DISCUSSION

**A. Likelihood of Success on the Merits**

Plaintiff argues that it is likely to succeed on the merits on the following grounds: (1) the Projects are not "changes or amendments" with "no or only minimal environmental impact" under CE 3.3.B.1; (2) Ninth Circuit authority demonstrates that "extraordinary circumstances" exist which preclude the use of a CE; (3) Defendants' tiering of the CE packages to the FMP was improper; and (4) Defendants' post-litigation accounts of analysis and ESA consultation documents are insufficient for a "hard look" under NEPA. The Court will address each argument and the relevant sub-arguments below in turn.

2

**1. CE 3.3.B.1**

**a) "Changes or amendments"**

Plaintiff argues that "[t]he District Court improperly relied upon the Seventh Circuit opinion, *Sauk Prairie Conservation All. v. U.S. DOI,* to conclude that the Projects are 'changes or amendments to an approved plan' under CE.3.3.B.1." According to Plaintiff, Sauk Prairie is distinguishable because the section of the opinion that the Court relied upon to reach its conclusion pertains to a Property and Administrative Services Act claim, not a NEPA claim. Additionally, Plaintiff argues that the Seventh Circuit in *Sauk Prairie* was not specifically presented with the issue of whether the challenged activities constituted "changes or amendments" to an approved plan.

Plaintiff's argument is unpersuasive because, as the Court stated in its Order, "neither party provided, and the Court's own research did not find, a definition of the phrase 'changes or amendments' as applied in § 3.3(B)(1)." Given this absence of a working definition, the Court relied on Sauk Prairie because it was "instructive" in being the only case the parties cited—if not the only case existing at the time—that analyzed CE § 3.3(B)(1). The Court acknowledged that although *Sauk Prairie* does not expressly define or discuss the meaning of the phrase "changes or amendments," the panel analyzed CE § 3.3(B)(1) and ultimately held that the challenged activities—dog training and off-road motorcycle riding—"fit[] comfortably within the categorical exclusion." Sauk Prairie, 944 F.3d at 679. This holding necessarily means that the activities constituted "changes or amendments" to an approved plan. Furthermore, *Sauk Prairie* is relevant because it analyzed, like the Court must do in this case, whether the challenged activities were consistent with an approved plan that did not expressly include those challenged activities. *Sauk Prairie* found that the challenged activities were similar in type as the approved activities and "consistent with the original purposes" of the approved plan. The Court found *Sauk Prairie*'s analysis instructive and held that the Projects' activities constitute "changes or amendments" to the FMP because they are a form of fire management and their stated purposes are "consistent with the original purposes" of the FMP.

**b) No or only minimal environmental impact**

Plaintiff argues that the Court's reliance on Defendants' ESF forms, FWS letters, FMP, and declaration regarding their convention with subject matter experts was improper because these documents do not include site-specific impact assessments of the Projects' activities and because the declaration is a post-litigation account that cannot serve as a substitute for contemporaneous records of the actual subject matter expert convention.

Programmatic environmental review, such as that in the FMP, "generally obviates the need" for subsequent review at the application or site-specific level unless "new and significant environmental impacts arise" that were not previously considered. Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt., 36 F.4th 850, 870 (9th Cir. 2022) (citing Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1356 (9th Cir. 1994)); Pit River Tribe v. U.S. Forest Serv., 469 F.3d 768, 783 (9th Cir. 2006). While some of the Projects' impacts in this case are "new" to the extent they are not explicitly discussed in the FMP EIS, the record indicates they are no more than minimal as discussed in the Court's order and, therefore, site-specific review was not necessary. See Klamath-Siskiyou Wildlands Ctr. v. United States Bureau of Land Mgmts., 2021 U.S. Dist. LEXIS 223221, *29 (D. Or. Aug. 24, 2021) (holding that a programmatic impact statement obviated the need for a subsequent site-specific impact statement because the challenged project did not present any new or significant environmental effects); Stevens Cty. v. United States DOI, 507 F. Supp. 2d 1127, 1135-36 (E.D. Wash. 2007) (same). Even if site-specific review was necessary, the record indicates that Defendants did conduct site-specific analysis through its CE packages. For example, the FWS consultation letter states that the Projects will occur in areas where fisher use is low, the Projects will retain the most important habit features for the fisher and will enhance corridors between core habitats, the Projects' removal of trees is not expected to substantially reduce the number of available fisher den trees at the landscape scale, and the Projects' selective removal of only conifers less than 20 inches in diameter and standing dead and down trees will ensure that fisher habitat will remain suitable. Doc. No. 39-1 at 6. The Wawona Road CE package also indicates that the NPS conducted surveys of the plants and vegetation

within the project area, including the density of trees within Merced Grove.  Doc. No. 38-5 at 2-6.  Furthermore, in contrast with the cases Plaintiff cites, Defendants did not submit only a declaration or post hoc rationalization to support their contention that they sufficiently analyzed the impacts of the Projects' activities.  See Doc. No. 38 at 36-38 (explaining Defendants' reliance on not just Dickman declaration but also ESF forms, FMP, and FWS letters).  As the Court noted, the declaration was one of several sources that Defendants submitted and that the Court reviewed in reaching its decision.

**2. Extraordinary circumstances**

Plaintiff argues that the Ninth Circuit opinion in *Bark v. United States Forest Serv.* demonstrates that "extraordinary circumstances" exist which preclude the use of a CE.  Specifically, Plaintiff contends that under *Bark*, the Court should have reversed Defendants' decision not to prepare an EIS because they ignored or failed to address "considerable scientific evidence" that created significant controversy about the impacts of the Projects' activities.  In *Bark*, which involved a challenge to the use of "variable density thinning," the Ninth Circuit found sufficient evidence of "significant controversy" in the following: (1) critical comments by subject matter experts during the administrative process that the challenged activities "could even make fire worse rather than better," (2) an article from Forest Ecology and Management purportedly stating that it is becoming more accepted that fuel reduction does not consistently prevent large forest fires, (3) a study published in The Open Forest Science Journal which concluded that fuel treatments are unlikely to reduce fire severity and consequent impacts, and (4) citations to more than ten expert sources supporting the plaintiff's view, including a report by the defendant itself which stated that reducing canopy cover may increase a fire's rate of spread. Bark v. United States Forest Serv., 958 F.3d 865, 870-71 (9th Cir. 2020).

Here, Plaintiff does not adequately explain that the Projects' activities equate to "variable density thinning," which is a practice in which "selected trees of all sizes . . . would be removed." Bark, 958 F.3d at 870 (emphasis added).  Instead, the record indicates that the Projects plan to thin select trees up to a certain size in designated areas.  Additionally, as the Court stated in its order,

Plaintiff provided four parenthetical references to show that "significant controversy" (and thus "extraordinary circumstances") exist regarding the Projects' activities. This evidence falls short of what the Ninth Circuit found sufficient in Bark, given that these references do not point to any critical comments by subject matter experts during the Projects' administrative process nor cite multiple expert sources in support of Plaintiff's view.

**3. Tiering of CE**

Plaintiff argues that Ctr. for Biological Diversity v. Salazar does not support the Court's finding that the tiering and incorporation by reference statutes do not preclude Defendants' CEs from referencing the FMP. Additionally, Plaintiff asserts that the Projects' "additional" activities do not qualify for tiering. Plaintiff also argues that the Court erred in concluding that Defendants' interpretation of the FMP was reasonable because the Court did not first determine whether the FMP was "genuinely ambiguous."

The Court stated in its order that the Ninth Circuit in Salazar affirmed the district court's holding that the tiering and incorporation by reference statutes do not preclude the defendant's CEs from referencing prior EAs. Ctr. for Biological Diversity v. Salazar, 706 F.3d 1085, 1098 (9th Cir. 2013). The Ninth Circuit specifically found that the CE's use of the prior analyses was appropriate. Id. Based on this precedent, the Court held that "Defendants are likely to succeed on the merits in that their use of the FMP's analysis in preparing the Project CEs was appropriate." As the district court held and the Ninth Circuit affirmed in Salazar, the tiering and incorporation by reference statutes do not preclude Defendants from referencing prior EAs (or EISs).

Furthermore, with respect to Plaintiff's argument regarding improper tiering of "additional" activities, the Court found that these activities were categorically excluded based on the Court's CE analysis. Contrary to Plaintiff's contention, the Court did not state that Defendants properly tiered to the FMP for actions that were not mentioned in the FMP EIS. The Court noted that the CE forms address the "new impacts" of those actions not directly covered by the FMP and explain how they "differ from [the FMP]." Doc. No. 71 at 33. Additionally, the Court stated that the Projects' activities tiered to the FMP in the sense that covered activities tiered to the FMP

while uncovered activities were subject to CE review, as the Court explained using the Merced Grove conifers as an example. See Doc. No. 71 at 33. The Court acknowledges that the challenged activities in this case often involve an activity that is both covered and uncovered by the FMP. For example, the "additional activity" of thinning conifers up to 20 inches in diameter in Merced Grove is covered to the extent that thinning conifers up to 12 inches in diameter is a covered activity while the thinning conifers between 12 and 20 inches in diameter is not expressly mentioned in the FMP. This distinction is important because the Court did not state that the uncovered activities properly tiered to the FMP. Rather, the Court found that the uncovered activities were categorically excluded under CE § 3.3(B)(1) based on the record.

Finally, the Court is not persuaded by Plaintiff's argument that the Court erred in deferring to Defendants' reasonable interpretation of the FMP. Plaintiff did not present this "Auer deference" argument in any of its prior briefing, and the single paragraph in which this argument appears in the current motion does not adequately brief the issue.

4. "Hard look" under NEPA

Plaintiff asserts that Defendants' post-litigation accounts of analysis and ESA consultation documents are insufficient for a "hard look" under NEPA. Dickman's post-litigation declarations summarizing past activities do form the core of the evidence relied upon to find that Plaintiff has not shown a likelihood of success on the merits on this point. Plaintiff acknowledges that its "argument is not that these events did not occur prior to the decision. Rather, Plaintiff's argument is that it is Defendants' burden to provide a contemporaneous record of analysis. Post-litigation summaries and explanations for what supposedly occurred are insufficient." Doc. No. 75 at 18. As explained in the prior Order, the Court may nevertheless "consider and rely upon declarations" in considering a motion for preliminary injunction. Earth Island Inst. v. Nash, 2020 U.S. Dist. LEXIS 71185, *17-18 (E.D. Cal. Apr. 21, 2020) (citing Johnson v. Couturier, 572 F.3d 1067, 1083 (9th Cir.2009) ("A district court may . . . consider hearsay in deciding whether to issue a preliminary injunction.")); Lane v. CitiMortgage, Inc., 2014 U.S. Dist. LEXIS 164275, *8 (E.D. Cal. Nov. 20, 2014) (same). "Such evidence need not conform to the standards for a summary

judgment motion. . . . And the weight to be given such evidence is a matter for the court's discretion, upon consideration of the competence, personal knowledge and credibility of the affiant." Nash, 2020 U.S. Dist. LEXIS 71185, at *18.  As discussed above Dickman's declaration does not stand alone, but is paired with other supporting documents.  This does not prejudge the sufficiency of this evidence at a later stage of the case, but at for a preliminary injunction, the combination of Dickman's declaration together with the FWS consultation letters is sufficient to negate the likelihood of success on the merits.

Plaintiff argues that "The FWS consultation letters are insufficient to constitute a 'hard look' because NEPA demands a much broader consideration of all impacts to ESA-listed species than ESA consultation." Doc. No. 75 at 17.  Defendants convincingly point out that an agency has complied with the "hard look" requirement by "documenting that the action falls within an established categorical exclusion." Cal. ex rel. Lockyer v. USDA, 575 F.3d 999, 1012 (9th Cir. 2009) (citing 40 C.F.R. § 1501.4 Ando West v. Sec'y of Dep't of Transp., 206 F.3d 920, 926-27 (9th Cir. 2000)).

## B. Irreparable Harm

In the prior Order, the Court determined that there was a danger of irreparable injury in the Projects' effect on "EII's supporters' ability to view and utilize the area in its undisturbed state and [impedance of] the aesthetic, professional, and recreational use and enjoyment of Yosemite Valley." Doc. No. 71 at 9.  This conclusion was reached by relying on All. For The Wild Rockies v. Cottrell, 632 F.3d 1127 (9th Cir. 2011) and League of Wilderness Defs./Blue Mts. Biodiversity Project v. Connaughton, 752 F.3d 755 (9th Cir. 2014) with the acknowledgment that there were other cases that weighed in favor of the opposite conclusion. Doc. No. 71 at 9-10.

Defendants disagree with this conclusion and largely rehash the arguments made in the underlying preliminary injunction motion. Doc. No. 78 at 20-22.  The earlier conclusion stands.  The case law on the subject is mixed and the appeal in this case is an opportunity for a higher court to provide additional clarity on the subject.

**C. Balance of Equities and Public Interest**

In the prior Order, the Court determined that "there is a serious threat of wildfire" and "Mitigation of the threat requires implementing the Projects as designed." Doc. No. 71 at 12 and 16. Plaintiff challenges this conclusion by arguing that "mitigating the fire and insect risks is relevant to the required balancing of interests, but such risks are only entitled to 'great weight' when they are both imminent and unable to be mitigated while a preliminary injunction is in place." Doc. No. 74 at 20.

Regarding imminence, the declarations of Garret Dickman and Nicole Athearn plus the fact that the Washburn Fire was burning near the Mariposa Grove this summer support the conclusion that fire is very much an imminent risk for all over the park. Plaintiff has not explained how the area around the Merced Grove does not suffer from these same risks. In contrast, Defendants argue that "the Grove sits at relatively low elevation, near human communities, and is therefore at much greater risk from a human-caused fire, compared to fires caused by lightning." Doc. No. 78 at 31.

Regarding mitigation, the thinning of the Merced Grove is to prepare it for controlled fires scheduled for the fall of 2023. Doc. No. 75 at 7. As stated in the prior Order, the major benefit of thinning smaller trees is to remove ladder fuels that can spread a fire from the ground to the treetops, creating a crown fire. Doc. No. 71 at 14. Plaintiff believes the relevant risk can be mitigated by pruning the branches of the smaller trees rather than removing them entirely. Doc. No. 75 at 20. In support, Plaintiff points out that the 2004 FMP called for removing ladder fuels by pruning branches. Doc. No. 29 at 86. While true, there is also the concern of overall density which "makes fire easier to spread from tree to tree and thus leads to more likely initiation and continuation of crown fire….increased tree density not only results in more ladder fuels being present, it also makes those fuels more effective I n allowing a fire to spread through the crown where it is more dangerous. Because 20" trees are generally taller and larger than 12" diameter trees, removing those trees increases the treatment's ability to achieve three of the four pillars of creating a fire-resistant forest: increasing the separation of surface and crown fuels, decreasing crown density, and protecting species of large trees that are fire-adapted, such as sequoias." Doc.

No. 78 at 32.  This concern was echoed in the briefing of the earlier Order, as Dickman had previously stated that "High live tree density and high density of dead biomass creates a situation that makes it extraordinarily difficult for firefighters to engage." Doc. No. 38-1 at 11.  "The Park would want to conduct the prescribed burns at higher temperatures to maximize their effectiveness, but it would not be safe to do so if the additional fuel load provided by trees between 12 and 20" remain." Doc. No. 78 at 33.  Defendants have adequately explained why pruning limbs and leaving increased tree density is not an adequate way of mitigating the risk.

As an additional, related argument, Plaintiff asks the Court to disregard Dickman's declarations as "unreliable" due to some corrections he has made to past statements. Doc. No. 79 at 21.  First, there is a correction to a project funding cut off date. Doc. No. 78-1 at ***24 and 25(e).  Second, Dickman states: "In my first declaration (paragraph 48) I said that 'conifers of any species less than <20' have ladder fuels that extend to the forest floor." That was an overstatement that is true of many trees but certainly not all. I agree with Ms. Khlosa that many trees do not have branches that touch the ground. As trees grow taller, they lose their live branches as they lose photosynthetic capabilities. Fire or wind often prunes off those branches but, in their absence, dead branches remain and can still function as vertical fuel for fire. Still, it is not particularly difficult to find examples of ladder fuels extending to the ground from a single tree." Doc. No. 78-1 at 18.  The Court understood Dickman's original statement to be as he has further elaborated. There was no assumption that every single tree under 20" had branches that touched the forest floor; rather that trees under that size trunk tended to have those low hanging branches.  The quote in context differentiated between trees with smaller and larger trunks in a way that suggested the difference was a matter of degree rather than an absolute categorical division: "Conifers of any species <20" have ladder fuels that extend to the forest floor due to the lack of fire.  Trees larger than 20" tend to not have branches that extend to the forest floor, because most of those trees established prior to fire suppression and have experienced fire that would prune the branches." Doc. No. 38-1 at 20-21.  The Court does not find these two instances likely to be intentional misrepresentations.

## IV. ORDER

Plaintiff Earth Island Institute's motion for an injunction pending appeal is DENIED.

IT IS SO ORDERED.

Dated:  December 12, 2022                              /s/ signature
                                                    SENIOR DISTRICT JUDGE